UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:21CR40 |
| | ) | Detention Hrg: May 12, 2021 |
| DAVID LEE JUDD | ) | |

## DAVID JUDD'S MOTION FOR RELEASE PENDING THE OUTCOME OF HIS CASE

### INTRODUCTION

David Lee Judd ("Mr. Judd"), through counsel, respectfully opposes the government's motion for detention in this case and seeks his release on conditions of home confinement and whatever other conditions the Court deems appropriate pursuant to the Bail Reform Act, 18 U.S.C. § 3142.

Mr. Judd is a 35-year-old with no history of violence. He is a college graduate and has earned a degree in hospitality management. At the time of his arrest, he was living in his family's home with his mother and ailing grandmother. After he lost his job as a manager at Chick-fil-a restaurant due to the pandemic, Mr. Judd devoted his time to providing full-time care for his grandmother. Mr. Judd is known in his community to be peaceful and law-abiding. An active member of his church, prior to his arrest, he taught Bible studies to adults every Sunday and continues to lead fellowship for inmates at the Northern Neck Regional Jail, where he is detained.

In addition to his religious devotion, Mr. Judd is a passionate conservative. And as a committed supporter of President Trump, Mr. Judd made plans to attend the widely promoted rally on January 6th, 2021. Mr. Judd was so excited to hear the President speak that he arrived at 2 a.m. to get a "good seat" on the Capitol grounds. Unlike many of the other protestors, he did not bring any covert communication devices, paramilitary gear, or a weapon to the rally, despite lawfully

1

Case 1:21-cr-00040-TNM   Document 55   Filed 05/07/21   Page 2 of 15

owning a firearm. Unlike the defendants who have been preventatively detained in these cases, he never intended to cause anyone physical harm and he did not injure anyone.

Mr. Judd was arrested in his home in Dallas, Texas on March 26, 2021. *See* Arrest Warrant, Doc. No. 5. He waived a detention hearing in the arresting district. On April 16, 2021, Mr. Judd was charged by Indictment with one count of 8 U.S.C. § 111 (Assaulting, Resisting, or Impeding Certain Officers or Employees); one count of 18 U.S.C. § 111(b) (Assaulting, Resisting, or Impeding Certain Officers or Employees While Using a Deadly or Dangerous Weapon); one count of 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding); one count of 18 U.S.C. § 231(a)(3) (Certain Acts During Civil Disorder); one count of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon); one count of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon); one count of 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and one count of 40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or Buildings). Each of these alleged offenses stem from the events at the Capitol on January 6th, 2021.

It took over one month for Mr. Judd to be transferred to this District. He was arraigned at his initial appearance on April 30, 2021. Undersigned counsel was appointed at the initial appearance and a detention hearing was scheduled for May 12, 2021.

The government seeks detention based primarily on evidence that Mr. Judd tossed a small firecracker into a crowd of people. First, any allegation of intent to cause harm, including bodily injury, is speculative. Indeed, he tossed it in the vicinity of his fellow protestors, not the police. Second, the video clearly shows that after he tossed it, nothing happened. No one was injured. Under these circumstances, the government cannot establish that the firework qualifies as a

2

"dangerous weapon." Therefore, detention is not warranted under 18 U.S.C. § 3142(f)(1). As such, the government must rely on § 3142(f)(2), which requires evidence that there is a serious risk that Mr. Judd will flee; or, in the alternative, a serious risk that Mr. Judd will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. 18 U.S.C. § 3142(f)(2). Because the government clearly cannot satisfy either basis, there are no grounds for detention in this case.

Moreover, even if the Court were to find that the firework qualifies as a dangerous weapon, the DC Circuit's controlling holding in *Munchel v. United States* proscribes detention here: given the complete lack of evidence that he ever previously or subsequently planned or participated in political violence, the government cannot articulate a specific danger to the community beyond the scope of the January 6th events. 991 F.3d 1273, 1283 (D.C. Cir. 2021). Without *any* extrinsic basis to support a proclivity towards violence, the government relies exclusively on video footage that appears to depict Mr. Judd throwing a small firecracker on January 6th. For reasons discussed below, that single act—through which he neither intended to cause bodily harm nor actually caused any bodily harm—cannot override all of the other factors that weigh strongly in favor of release.

## ARGUMENT

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §§ 3142(b), (c)(1)(B).

The Supreme Court has explained: "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739,

755 (1987); *see also United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose."). As a general rule, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id*. at 1405.

The government bears the burden of demonstrating, by clear and convincing evidence, that preventative detention is necessary to ensure the safety of the community.

    **A. The Government Cannot Establish that the Firework Mr. Judd Allegedly Held is a "Dangerous Weapon."**

The video footage submitted by the government clearly shows that the Mr. Judd did not use the small firework in a manner consistent with a dangerous weapon, as defined by the D.C. Circuit:

> In the District of Columbia, a dangerous weapon is anything that is *likely* to produce death or great bodily injury by the use made of it. An object is likely to produce great bodily injury if: (1) the design of the object is such that in its ordinary use it is likely to cause great bodily injury; or (2) the surrounding circumstances indicate that an object capable of causing great bodily injury is likely in fact so to be used.

*United States v. Broadie*, 452 F.3d 875, 881–82 (D.C. Cir. 2006) (citing *Strong v. United States*, 581 A.2d 383, 386 (D.C.1990)) (internal quotations omitted).  This dual-prong approach was recently reiterated by this Court in the context of the January 6th events. *See United States v. Klein*, No. CR 21-236 (JDB), 2021 WL 1377128, at *6 (D.D.C. Apr. 12, 2021) (citing *Bullock*, 970 F.3d); *see also United States v. Chansley*, No. 21-CR-3 (RCL), 2021 WL 861079, at *7 (D.D.C. Mar. 8, 2021) (noting that the Bail Reform Act does not provide a definition for "dangerous weapon" and relying on court holdings in similar contexts elsewhere in Title 18).  Significantly, in some contexts, even otherwise dangerous objects such as knives are not inherently dangerous weapons

4

merely because they have the *potential* to cause injury. *See Broadie*, 452 F.3d at 882. This is because knives have alternative primary uses. Instead, for an object to be "inherently dangerous," its primary or ordinary use must be *likely* to cause great bodily injury. *Id*. at 881 (emphasis added).

The Merriam-Webster dictionary defines "firecracker" as a "paper cylinder containing an explosive and a fuse and set off *to make a noise*,"[1] and at least one court has recognized firecrackers as having a "useful social and commercial purpose." *United States v. Johnson*, 152 F.3d 618, 627 (7th Cir. 1998) (in examining whether a defendant had designed a destructive device). As this Court is likely aware, firecrackers are used in traditional celebrations the world over and often have important cultural significance.[2] Because of their common use in crowded, celebratory events, by their very nature, small firecrackers like the one used by Mr. Judd are intended to be used near people, such that the audible "bang"—its central thrill—can be experienced by bystanders. Thus, it is clear that firecrackers have an ordinary use that is not likely to cause death or severe bodily injury, even when used in proximity to others. As such, they cannot, by controlling definition, be "inherently dangerous." *See Broadie*, 452 F.3d at 881.

Furthermore, there is nothing in the record to indicate that the firecracker was used in a particular way that was likely to endanger life or inflict great bodily harm. Nothing suggests that the firecracker at issue was anything other than a standard, noise-producing instrument. The best evidence of this is, of course, the fact that nobody was harmed by its release: no bodily injury, "great" or otherwise, was intended or resulted. In fact, the only reaction to the firecracker was a

---

[1] Firecracker, Merriam-Webster (May 4, 2021) (emphasis added), https://www.merriam-webster.com/dictionary/firecracker.

[2] *See, e.g.*, Alexis Stempien, *The Evolution of Fireworks*, Smithsonian Science Education Center (Jul. 1, 2015) (explaining that firecrackers were invented in China and have been used to ward off evil spirits and to mark celebratory occasions there for more than a thousand years), https://ssec.si.edu/stemvisions-blog/evolution-fireworks.

momentary, ambiguous exclamation from a single, unidentified member of the crowd. *See* Gov't Br., Doc. No. 44 at 8. It is difficult to construe a firecracker as a "dangerous weapon" when the very use that is characterized as "dangerous" produced so little notice, or reaction. Because the government cannot establish that the firecracker was an ordinary instrument used in a manner likely to cause great bodily harm, it fails to satisfy the second *Broadie* basis for qualifying as a dangerous weapon. *Broadie*, 452 F.3d at 881-82.

The government cannot establish that the firecracker was dangerous weapon under either *Broadie* prong for the purposes of § 111(b).

### B. The Government Cannot Prove by Clear and Convincing Evidence that Detention is Necessary to Assure the Safety of the Community.

Even if the Court finds that the firecracker is a dangerous weapon, the danger inquiry does not end there. Under the Bail Reform Act, the Court must consider the following factors when determining whether the government has set forth clear and convincing evidence that Mr. Judd be detained: 1) the nature and circumstances of the offense charged; 2) the weight of the evidence; 3) the history and characteristics of the person charged; and 4) the nature and seriousness of the danger posed by the person to any person in the community if he is released. 18 U.S.C. § 3142(g). As explored *infra*, the balance of these factors weighs strongly in favor of release. As such, this Court should release Mr. Judd with the conditions it deems necessary.

#### 1. The Nature and Circumstances of the Offense Charged

By way of background, Mr. Judd's support of the former President began in early 2015, when he was working at a stadium in Texas and was able to attend one of the President's early campaign rallies. He thought the President was funny and that he showed that he cared about the American people. Mr. Judd also felt that the President shared his conservative values. So strong was his commitment to the President that in October 2020, Mr. Judd traveled to Maine as part of

Stampede America[3] to canvass for President Trump.  Leading up to the 2020 election, he also attended additional Trump rallies.  Throughout the process, Mr. Judd was an engaged, lawful, peaceful participant in our democratic process; he never affiliated with any radical groups, which espoused violence, and in expressing his political views and he never engaged in violence or encouraged violence.  Indeed, Mr. Judd's stepfather explains: "I remember his excitement when he was chosen to campaign for President Trump in Maine. . . . This then led to his trip to D.C.  He wanted to show his passion, support, respect, and gratitude for his country and former President."[4]  Mr. Judd decided to attend the event on January 6th to show support for the President and because at that time—based on media reports and other statements by political leaders—he believed, like millions of Americans, that election fraud had occurred.

The government attempts to distract from the lack of probative evidence of danger by emphasizing his post seeking a ride to Washington, D.C. that indicated (truthfully) that he has a lawful license to carry a firearm.  *See* Gov't Mot., Doc. No. 44 at 11.  Reading any implication here is beyond speculative.  Mr. Judd never said anything about using the firearm nor did he bring it with him to the Capitol on January 6th, despite the positive response.

Mr. Judd drove from Dallas to the Washington area with two women who responded to the post.  He arrived on the mall very early in the morning so that he could secure a good spot to see the President speak.  He spent the day listening to the President and the other speakers, cheering with other supporters.  In the afternoon, as the crowd swelled towards the Capitol building at the direction of the President, Mr. Judd moved with them.  The government suggests that Mr. Judd

---

[3] According to its website, Stampede America is "group of conservative activists across the nation who engage voters on important issues in local, state, and federal elections and government." https://www.stampedeamerica.com/about-us

[4] Letter of Jay Conley, attached hereto as part of Exhibit 1.

was involved with the group of people who were alleged to have grabbed police shields to form a barrier, but the video evidence shows just the opposite: Mr. Judd is seen allowing shields to pass over his head and by him and passing one shield. He never took possession of a shield, shoved anyone with a shield, or used a shield to threaten anyone.

Importantly, Mr. Judd's alleged conduct stands apart from that of defendants who have been preventatively detained in that 1) he did not injure anyone and 2) he is not and never was a member of a radical group such as the Proud Boys and 3) he did not make threats, intend, or plan to commit violence. *C.f., United States v. States v. Quaglin*, No. 1:21-cr-40-TNM (detention ordered for defendant whose media posts suggest he is a member of the Proud Boys and who is depicted on video spraying MK-9 OC directly into an officer's unprotected face and physically striking an officer in the face with a plastic shield. Quaglin's social media posts also suggest that he planned violence for months in advance and celebrated his role after the protest turned into a riot, *see* Doc. No. 14).

In seeking detention, the government relies—as it must—on Mr. Judd's alleged tossing of a small firecracker, which injured no one. Even assuming, *arguendo*, that Mr. Judd actually threw a small firecracker, the nature of the alleged offense is still not sufficiently dangerous to weigh in favor of detention. To underscore the lack of danger, it is important to contextualize the alleged conduct. The following cases are those in which defendants were released despite having engaged in far more dangerous, threatening conduct:

- *United States v. Richard Barnett*, 1:21CR38-CRC, Barnett (now famously) entered the Capitol building armed with a stun gun, brazenly sat at Speaker Pelosi's desk and posed for photos. He is also alleged to have stolen an envelope from the Speaker's office. *See* Doc. No. 3 (Amended Complaint and Statement of Facts). Barnett is charged with,

*inter alia*, knowingly entering and remaining in any restricted building without lawful authority while armed with a dangerous weapon, in violation of 18 U.S.C. §1752.  On April 27, 2021, Judge Cooper granted his motion for reconsideration of bail and ordered him released into the High Intensity Supervision Program.  *See* Doc. No. 29.

- *United States v. Robert Sanford,* 1:21CR52-ZMF, Sanford is alleged to have hurled a fire extinguisher into a crowd of police officers and striking at least three officers in the head. Video footage allegedly captures Sanford screaming "traitors" and "cowards" at the officers.  *See* Doc. No. 10 (Government's Opposition to Defendant's Motion to Reconsider Detention).  Like Mr. Judd, Sanford is charged with, *inter alia*, assaulting police officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).  Yet on March 2, 2021, Judge Friedman granted Sanford's motion for release and placed him on GPS monitoring.  Doc. No. 11.

- *United States v. David Alan Blair,* 1:21CR86-CRC*,* Blair was captured on body worn camera brandishing a lacrosse stick which served as a pole for a large confederate flag.  *See* Doc. No. 1 (Complaint and Statement of Facts).  While walking back and forth between the crowd and police officers, Blair is alleged to have exhorted, "hell naw, quit backing up, don't be scared. . .".  As an officer advanced, Blair yelled at the officer: "what's up motherfucker, what's up, what's up bitch." *Id*.  He then struck the officer in the chest with the lacrosse stick and had to be forcibly restrained by multiple officers *Id*.  Notwithstanding this *direct* physical assault with a lacrosse stick, Blair was ordered released subject to conditions.  Doc. 6.  Like Mr. Judd, Blair is charged with, *inter alia*, assaulting police officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

- *United States v. Federico Klein,* 1:21CR236(JDB), Klein is depicted on body worn camera "wedging [the] shield between the doors to the Capitol at approximately 3:00 p.m. in an apparent effort to prevent the officers from closing the doors." Doc. No. 29, p. 3 (Order granting motion to revoke detention order). Another video showed Klein "pushing the shield into an officer's body in an attempt to break the police line." Id. Despite this direct contact, the Court concluded that "Klein does not pose a substantial prospective threat to the community or any other person." *Id*. at 25. Likewise, in Mr. Judd's case, the government cannot show that poses a continuing danger to the community, especially now that the events of January 6 have dissipated.
- *United States v. Patrick McCaughey,* 1:21CR40(TNM), This Court recently granted Mr. McCaughey's motion for release, based on, in part, the lack of evidence that McCaughey had used a shield in a manner that made it a dangerous weapon. Likewise, the government cannot establish that Mr. Judd used a firecracker, which may not have gone off and did not injure anyone, in a manner that qualifies it as a dangerous weapon.

2. **The Weight of the Evidence**

The weight of the evidence that Mr. Judd exercised his First Amendment Right to attend a rally organized by the former President's supporters is, of course, overwhelming. But as to the critical issue in this case—whether he used a dangerous weapon—the evidence weighs squarely against the government. Despite clear footage of the incident, there is every indication that the firecracker was used in a manner that was *not* dangerous.

The lack of evidence supporting the 111(b) charge is made clear by the government's ambiguous attempts to link Mr. Judd to other protestors, without clarifying how it perceives the conduct to be a violation of any law. Specifically, it argues: "Judd can be seeing lifting an

American flag in the air triumphantly moments after another rioter throws a long projectile at others." Government's Brief, Doc. No 44, at 10.  Does the government suggest that the raising of a flag, in conjunction with the chaotic activity around him, means that Mr. Judd was tacitly approving of an illegal act? Does it mean that he was aiding and abetting the act? Attributing the projectile to Mr. Judd is hyperbole.  There is no way to discern from the video why Mr. Judd waved a flag, at that moment or at any other.  Indeed, Mr. Judd was waving a flag throughout much of the day, not to celebrate violence, but in support of what he had hoped would be a great day for democracy.

   **3. The History and Characteristics of the Person Charged**

The attached letters are the best testament to Mr. Judd's character. While a subset is highlighted here, undersigned counsel respectfully requests that the Court review the attached letters from Mr. Judd's family and neighbor attached hereto as Exhibit 1.

Mr. Judd was born and raised in Dallas, Texas.  He and his two siblings enjoyed a stable, two-parent, middle class childhood.  He attended college at University of North Texas where he earned a degree in hospitality management.  He has long been an active member of the Grapevine Church of Christ.  In 2018 tragedy struck the family when his father suddenly died after slipping in the bathroom and hitting his head.  Soon thereafter, Mr. Judd's grandmother was diagnosed with COPD.  When he lost his job as a manager at the Dallas Airport's Chik-fil-a due to the pandemic, Mr. Judd because his grandmother's fulltime caretaker.  He was understandably devastated to learn she passed away shortly after he was arrested in this case.  He still carries grief and guilt that he was not by her side when she passed.

By all indications, Mr. Judd has led a wholesome, law-abiding life. It is clear from the letters in support and otherwise that Mr. Judd's participation in the events on January 6th was an

extreme outlier in conduct, such that they have no precedential or predictive value for future conduct.

4. **The Nature and Seriousness of the Danger Posed by the Person to any Person in the community if he is Released.**

As it relates to the January 6th cases, the D.C. Circuit recently held that: "[t]o order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community. The threat need not be of physical violence, and may extend to "non-physical harms such as corrupting a union. But it must be clearly identified." *Munchel*, 991 F.3d at 1283 (citation and internal quotations omitted).[5] The D.C. Circuit further held that this Court must consider the specific circumstances that made the defendant's dangerous conduct possible. *Id.* ("The District Court also failed to demonstrate that it considered the specific circumstances that made it possible, on January 6, for Munchel and Eisenhart to threaten the peaceful transfer of power. The appellants had a unique opportunity to obstruct democracy on January 6…"). Thus, if this Court follows the directive to "consider [the threat] in context," it should find that Mr. Judd does not pose a particular danger because the circumstances that presented themselves that day—including encouragement by the former President—are no longer present. Indeed, the only other times he engaged the political process were entirely lawful. Before January 6th, Mr. Judd was an engaged member of the democratic process—someone whose lawful

---

[5] In *Munchel*, the Circuit did not find that the government had sufficient evidence of dangerousness where the defendants went to the January 6th rally with tactical vests, a stun gun and at least a pocketknife. 991 F.3d at 1276. They met with members of the Oath Keepers militia and bragged about "enter[ing] the building with armor and f_ing weapons." *Id*. Once inside, they gathered zip ties and went to the Senate gallery. *Id*. When agents searched their home, they found firearms and a "large quantity of loaded magazines." *Id.* at 1277. By contrast, the government does not allege that Mr. Judd brought equipment such as a tactical vest, or a weapon such as a stun gun or a knife. Mr. Judd did not meet with any militia members. And like the defendants in *Munchel*, he had no physical interactions and did not vandalize any property when inside the Capitol.

activism is encouraged by political leaders on both side of the aisle. Mr. Judd's limited participation was fully bounded by the scope of the January 6th events. The attached letters describe a peaceful, law-abiding young man. In short, the government cannot establish that he presents a danger to the community if he is released.

**B. The Government Cannot Show Mr. Judd is a Flight Risk**

The burden of persuasion regarding risk-of-flight always remains with the government, irrespective of applicable presumptions. Any decision about whether Mr. Judd poses a serious risk of flight must focus on whether *any* combination of conditions could assure Mr. Judd's return if released pending trial. 18 U.S.C. § 3142(f)(2).

"[A] defendant's past conduct is important evidence—perhaps the most important—in predicting his probable future conduct." *Pope v. United States*, 739 A.2d 819, 827 (D.C. App. 1999) (internal citations omitted). There is nothing in Mr. Judd's record to show he is a flight risk or a danger to the community. He lives in Texas with his loving family. He is an active member of his church and his community. The attached letters demonstrate his deep ties to his community and his non-violent character.

Furthermore, and perhaps more importantly, Mr. Judd has limited financial resources, rendering him largely incapable of fleeing. *See United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662 (D.D.C. Feb. 26, 2021) ("[T]here's nothing in the record suggesting [the defendant] has much in the way of accumulated financial resources, and therefore he doesn't appear to have way to finance flight from the jurisdiction for any extended period of time"); *United States v. Nwokoro*, 651 F.3d 108, 110–11 (D.C. Cir. 2011) (noting that evidence "favoring appellant's pretrial release" included the fact that appellant had no assets under his control, no ability to flee the country, and "no prior criminal record").

Mr. Judd has neither the incentive to leave Texas nor the financial resources to do so. As such, the government cannot establish that he is a flight risk.

## CONCLUSION

Bail conditions including home confinement, electronic GPS monitoring, and third-party custody, would be sufficient to mitigate any risk to the community and to secure Mr. Judd's appearance in court. For all of the reasons stated above, the Court should reject the government's request for pretrial detention and should release Mr. Judd on home confinement or under any other conditions the Court sees fit to impose.

Respectfully submitted,

David Judd

By Counsel

\_\_\_/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
DC Bar Number 484020
Assistant Federal Public Defender

Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0879 (T)
(703) 600-0880 (F)
Elizabeth_Mullin@fd.org (email)

CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2021, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

___/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
DC Bar Number 484020
Assistant Federal Public Defender