# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-cr-40-TNM** |
| | : | |
| **DAVID LEE JUDD,** | : | |
| Defendant. | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S  MOTION TO COMPEL DISCOVERY IN SUPPORT OF MR. JUDD'S CLAIM OF SELECTIVE PROSECUTION

The United States of America hereby respectfully submits its opposition to the Defendant's Motion to Compel Discovery in Support of Mr. Judd's Claim of Selective Prosecution in the above-captioned case.  Defendant seeks discovery on his claim that the government selectively targeted him for prosecution due to his political beliefs.  Because Judd's motion (Doc. 138) does not satisfy the rigorous standard for discovery in this setting, this Court should deny it.

## Factual Background

The grand jury charged Judd with one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); two counts of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); one count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) and (2); one count of Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); one count of

Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); and two misdemeanor offenses under 40 U.S.C. § 5104(e)(2). Doc. 102.  These charges all stem from Judd's conduct at the U.S. Capitol on January 6, 2021.

On January 6, a joint session of Congress convened to certify the votes of the Electoral College for the 2020 Presidential Election, which took place on November 3, 2020.  At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Michael R. Pence was present and presiding, first in the joint session and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol.  Officers with the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD") attempted to keep the crowd away from the building.  Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol by, among other things, breaking windows and assaulting both USCP and MPD officers as others in the crowd encouraged and assisted those acts.  In response to this intrusion, representatives, senators, and Vice President Pence evacuated their respective chambers around 2:20 p.m.

After the Capitol was breached, USCP requested assistance from MPD and other law enforcement agencies in the area to protect the Capitol, keep more people from entering the Capitol, and expel the crowd that was inside the Capitol.  Multiple MPD officers and other law enforcement officers came to assist.

By 2:30 p.m. on January 6, 2021, rioters had engulfed the west side of the Capitol and officers had begun retreating from the first landing of the Lower West Terrace, as shown in the still from USCP surveillance below.



Around the same time, rioters were climbing on the scaffolding in front of the building and other features of the building.  Although the Capitol Building had already been breached and protesters had flooded in through several entrances, a group of MPD officers and members of the USCP and other agencies called to assist gathered to protect the Capitol at the very prominent entrance on the second landing of the Lower West Terrace.  (This is the exit through which the President typically comes through during inauguration, as pictured below in a photo from later that night.)  To enter the Capitol through the Lower West Terrace doors on January 6, one had to walk, climb, or scale up to the second landing, go up a set of stairs, walk through an arch and a short tunnel, and then walk through a series of glass doorways that the officers had locked.  The

tunnel and doorways are very narrow, with the entryway through the doors measuring only around ten feet across.



Around 2:40 p.m., a group of law enforcement officers were maintaining a line at the second set of glass doors inside the tunnel.  Officers reporting to the scene rushed to the tunnel from within the building while protesters outside of the tunnel continued to summon more men to push their way through the tunnel.  A growing number of protesters made their way into the tunnel with a variety of tools and weapons.  The tunnel became the point of an intense and prolonged clash between protesters and law enforcement at the United States Capitol.  Many of the protesters

in the tunnel were recording videos, and many of the videos circulated and continue to circulate on Internet channels, social media, and the news.

Portions of the rioters' effort in the tunnel to get through the Lower West Terrace doors were captured both in video surveillance from a USCP camera in the tunnel and in video footage posted to YouTube (hereinafter, YouTube Video 1).  Around 2:52 p.m., YouTube Video 1 shows a white male with curly blonde hair wearing a red "Make America Great Again" baseball hat backwards, a black hoodie, and a grey vest, who was subsequently identified as Judd, to the side of the entrance of the tunnel.

Then, at approximately 2:56 p.m., Judd can be seen in surveillance footage going into the tunnel with additional rioters walking toward the line of law enforcement guarding the Lower West Terrace doors, as shown in the still image below with a red rectangle added around Judd.



As captured on surveillance video, Judd then joined the group as the rioters pushed in unison against the officers.  As captured in video filmed on the phone held by co-Defendant Tristan Stevens, who was next to Judd in the tunnel, multiple rioters yelled "ready, heave" as

Judd, Stevens, and the group pushed in unison against the officers guarding the doors.

Then, at approximately 2:58 p.m., Judd can be seen in USCP surveillance footage turning around and exiting the tunnel.  Surveillance footage over the next few minutes shows Judd remaining near the arch, occasionally waving others into the tunnel and yelling.

Around 3:06 p.m., as captured by another video filmed outside of the arch and posted to YouTube (hereinafter, YouTube Video 2), Judd can be seen next to co-defendant Robert Morss as Morss yells for the crowd to pass back riot shields that had been stolen from law enforcement in order to make a "shield wall."  Judd can also be seen yelling "shield wall" as he pumps his fist in the air in YouTube Video 2.

Surveillance video, which captured the same events from a different perspective, then shows Judd helping move at least two shields into the tunnel and pass them to another rioter in front of him around 3:06 p.m., as shown in the still below with a red circle around Judd.



Moments later Judd can be seen on the surveillance footage walking into the tunnel.  He

then lights a cylindrical object on fire and throws it at the line of law enforcement officers who are guarding the Lower West Terrace doors to the United States Capitol Building, as shown in the stills below.  He then immediately turns and walks out of the tunnel.  As captured in another video filmed inside the tunnel and originally posted to YouTube (hereinafter, "YouTube Video 3"), immediately after Judd begins to walk away, an unidentified member of the crowd (who can be seen standing next to Judd in surveillance video when he throws the item) can be heard yelling: "You going to do that and run away! What the fuck."  When asked what the individual did, the unidentified member of the crowd states:  "He threw a firecracker, a big giant, what the …."



It bears noting how small and crowded this tunnel was.  As evidenced in the still shot from the surveillance video right after he lit the firecracker, the tunnel is so small it does not appear to be wide enough to fit more than 10 people standing shoulder to shoulder.  (Judd is indicated by the green box.)



Despite its small size, it was full of people, both other rioters, who are visible in the still shot above, and the law enforcement officers that were standing underneath the camera capturing Judd's actions.  As visible in the still shot below from YouTube Video 1, around 3:07 p.m. where what appears to be the lit firecracker thrown by Judd is visible in the top left-hand corner (as marked by an added red box), law enforcement officers were packed shoulder to shoulder in the area where Judd threw the firecracker.  (The surveillance camera capturing Judd throwing the firecracker is located directly above the first set of doors visible in this still shot.)



8

As captured on Body Worn Camera footage, an officer in the tunnel can be heard reacting to the firecracker around the same time, yelling what sounds like "a firework!" through his gas mask and turning his head in the direction of where the firework appears to land based on the video still shot shown above.  Another can be heard on Body Worn Camera footage warning his colleagues about the firecracker on the ground.  Thankfully, despite being lit and thrown at the officers, it appears that the firecracker failed to explode.  Instead, based on currently identified Body Worn Camera footage and surveillance footage near where it was thrown, the firecracker streamed smoke into the area of the tunnel where law enforcement officers were standing.

As seen on USCP surveillance video, after throwing the firecracker and leaving, Judd then stayed at the entrance to the tunnel and appeared to be directing the crowd to the tunnel by waving them forward.  Additional USCP surveillance footage and many different videos posted online show Judd present at various locations near the arch entrance of the Lower West Terrace tunnel for approximately the next hour.  In these various videos, Judd can be seen chanting with the crowd, encouraging people to enter the tunnel, and assisting the rioters exiting the tunnel with washing the OC spray from their faces with water.

For example, in a video posted to Parler and then posted online, which corresponds to USCP surveillance from around 4:14 p.m., Judd can be seen triumphantly lifting an American flag in the air moments after another rioter threw a long projectile at the officers, as shown in the stills below (with the projectile highlighted in a yellow rectangle and Judd in a red rectangle).





Then, around 4:16 p.m., as can be seen in USCP surveillance footage, Judd once again joined a large group of rioters pushing against law enforcement officers guarding the Lower West Terrace doors, as shown in the still below with a red rectangle around Judd.   The rioters pushed as a group against the officers for a few minutes until they were once again forced back out of the tunnel by law enforcement.



The same events were captured near the end of another video posted to YouTube, ("YouTube Video 4"), in which unidentified rioters can be heard yelling "push" as the crowd all tried to push into the tunnel and past the line of law enforcement.  Judd can be seen joining the crowd at the tunnel entrance pushing forward toward the police line, as shown in the still below.



.

After an arrest warrant was issued, FBI agents arrested Judd at his residence in Carrolton,

Texas on March 26, 2021.

## <u>Argument</u>

In a motion riddled with speculation and insinuations, Judd alleges that the government

selectively targeted him for prosecution based on his political beliefs.  He specifically references

the charge for assaulting an officer with a dangerous weapon in violation of 18 U.S.C. § 111(b)

for his decision to light a firecracker inside a small tunnel filled with people and throw it at

officers guarding an entrance to the Capitol on January 6, 2021.  Judd contends that the

government failed to prosecute similar conduct occurring during protests around the Portland,

Oregon federal courthouse in May and June 2020.

Judd's motion fails the threshold evidentiary showing for a selective-prosecution claim.

His request for discovery should be denied.

**I.    A defendant must make a "rigorous" showing on each element of selective
prosecution before he can obtain discovery on the issue.**

Because "[t]he Attorney General and United States Attorneys retain broad discretion to

enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial

decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks and citations omitted). This presumption "rests in part on an assessment of the relative competence of prosecutors and courts." *Id.* at 465. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Ibid.* (citation omitted). "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (cleaned up). So "the presumption of regularity" applies to "prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." *Id.*

As a result, "[i]n the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Armstrong*, 517 U.S. at 464.

This presumption of regularity "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465. To overcome the presumption of regularity and obtain dismissal of the criminal charges, a defendant must present "clear evidence" that the government's decision to prosecute was "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 464-65 (citations omitted).

Concerned that selective-prosecution inquiries "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy," the Supreme Court has also imposed a "correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 468.  The defendant must initially produce "some evidence tending to show the existence of the essential elements of" selective prosecution, which are: "discriminatory effect and discriminatory intent." *Ibid*. (citation omitted).  The defendant's evidence must also be "credible"—something more than "personal conclusions based on anecdotal evidence." *Id*. at 470.  "If either part of the test is failed," the defendant cannot "subject[] the Government to discovery." *Att'y Gen. of United States v. Irish People, Inc*., 684 F.2d 928, 947 (D.C. Cir. 1982); *see also United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008) ("[D]iscovery will not be allowed unless the defendant's evidence supports each of the two furcula of his selective prosecution theory: failure on one branch dooms the discovery motion as a whole").

## II.      Judd fails to proffer any evidence supporting an inference of selective prosecution.

Judd has failed to make the threshold showing on either selective-prosecution element.  He has not presented any evidence suggesting "that (1) [he] was singled out for prosecution from among others similarly situated and (2) that [his] prosecution was improperly motivated." *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)).  "[T]he standard is a demanding one." *Armstrong*, 517 U.S. at 463.

### A. Judd has not made a colorable showing that the government singled him out for prosecution.

Judd must first adduce evidence that "others similarly situated generally have not been prosecuted for conduct similar to that for which he was prosecuted." *Irish People, Inc.*, 684 F.2d

at 946 (citation omitted).  As a judge of this Court explained, an individual may be similarly situated if he "committed the same basic crime in substantially the same manner as the defendant— so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *United States v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019) (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)); *see also United States v. Lewis*, 517 F.3d 20, 27-28 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced. … A multiplicity of factors legitimately may influence the government's decision to prosecute one individual but not another.  These may include, inter alia, the comparability of the crimes, the similarities in the manner in which the crimes were committed, the relative efficacy of each prosecution as a deterrent, and the equivalency of the evidence against each prospective defendant.") (internal citations omitted).

Judd fails this showing.  A selective-prosecution claim requires the defendant to identify "similarly situated" individuals who "have not been prosecuted," *Irish People, Inc.*, 684 F.2d at 946 (citation omitted), and Judd has pointed to no such individual.  He instead cites thirty-nine cases (from a sample of seventy-four) where the government charged the defendant with federal offenses arising from riots around the federal courthouse in Portland, Oregon and subsequently dismissed the charges, entered a deferred-prosecution agreement, or acceded to the defendant's guilty plea on reduced charges in many of those cases. Doc. 138 at 5.[1]

---

[1] Judd's motion further references details from the docket for four of these cases, and one case in D.C. Superior Court, where, in his view, the defendant's alleged conduct mirrored his actions on January 6, 2021. Doc. 138 at 4-6.

This comparison fails, first and foremost, because the government actually charged nearly all defendants in the listed Oregon cases with civil-disorder or assault offenses.  *See* Doc. 138-1. As such, he has failed to "show anyone in a similar situation who was not prosecuted."  *Irish People, Inc.*, 684 F.2d at 946.

Moreover, of the cases cited by Judd, those whose conduct is most similar to Judd, i.e., cases involving lighting and throwing a firework of some kind on video, were also all charged with comparable felony offenses for their conduct (and none were dismissed as part of a deferred resolution agreement or pled down to a misdemeanor).  For example, Isaiah Maza, Jr. -- the only other individual cited in Judd's group who allegedly lit and threw some kind of pyrotechinic[2] at federal law enforcement officers or those assisting them -- was indicted on the exact same charge as Judd, a violation of 18 U.S.C. § 111(b).  *See United States v. Isaiah Jason Maza, Jr.,* case no. 3:20-cr-00343 (D. Ore. filed Aug. 19, 2020).  Moreover, the charges against Maza were only dismissed because the defendant died before trial and not as part of a resolution with the government.  (Judd's summary chart is inaccurate as to this charge, as it does not list the actual indicted charges in the case.)  Similarly, Ty John Fox — whose case is still pending and who allegedly lit and threw a firework near officers standing outside of a police precinct – was indicted on one of the same felony charges that Judd is also facing, a violation of 18 U.S.C. § 231.[3]

_____

[2] The affidavit in support of the arrest warrant describes the object as a "yellow cylindrical object" with a "string attached to the cylinder" that appeared on video to spark, like a lit fuse. *United States v. Isaiah Jason Maza, Jr.,* case no. 3:20-cr-00343 (D. Ore. filed Aug. 19, 2020), Doc. 7-1 at 4. The defendant claimed it was a "pyrotechnic as big as his hand," which he thought was a "ground bloom" (which is a type of firework) that "would not cause a big explosion." *Id*. at 9.  In video surveillance, Judd is likewise seen lighting a cylindrical object about the size of his hand with a string that appeared to spark after Judd lit it.

[3] Unlike Judd, Fox also appears to involve parallel criminal charges before the Oregon courts and a decision by the Oregon U.S. Attorney to defer to state counterparts, which of course increases the differences between the cases. *See, e.g*., *United States v. Fox*, 3:20-cr-501 (D. Or.) (information recited in motion to continue trial date at Doc. 15)

(Notably, because Fox appears to have thrown the firework at state police officers, not at federal law enforcement officers or those assisting them like in Judd's case, and did not do so on federal property, it does not appear that Fox's actions could qualify for an 18 U.S.C. § 111(b) charge, as it would not meet the requisite elements.  For the same reasons, the additional D.C. Superior Court case cited by Judd, *United States v. Alana Rogers*, 2020 CF3 006970, similarly would not meet the elements for a federal 18 U.S.C. § 111(b) charge.)

Further, contrary to his claims, each of the three cases Judd cites in his motion as examples where a defendant had only been charged with a misdemeanor actually involved a felony charge to 18 U.S.C. § 111(a).  Although it is true that each case was eventually dismissed by the government for unknown reasons (typically after the defendants repeatedly agreed to waive their rights to a preliminary hearing or indictment over a period of months), all were initially facing felony charges.  For example, Judd states that the defendant in *United States v. Johnson,* case no. 3:20-mj-00170 (D. Ore. July 27, 2020), was charged solely with a misdemeanor.  Doc. 138 at 4 ("In contrast to Mr. Judd, the defendant was only charged with a misdemeanor, which the government eventually moved to dismiss without prejudice.)  However, the affidavit in support of the arrest warrant clearly states that Johnson was being charged with a felony.[4]  Similarly, the affidavit in support of the arrest warrant for *United States v. Bouchard,* case no. 3:20-mj-00165 (D. Ore. July 24, 2020), also makes it clear he was being charged with a felony, contrary to Judd's claims.[5]  The third case cited by Judd also appears to have involved a felony charge, not a

---

[4] *Id.*, Doc. 1-1 ("I submit this affidavit in support of a criminal complaint and arrest warrant for Jordan Matthew JOHNSON.  As set forth below, there is probable cause to believe, and I do believe, that JOHNSON committed the offense of Assaulting a Federal Officer (felony), in violation of 18 U.S.C. § 111(a)(1).")

[5] Doc. 1-1 ("As set forth below, there is probable cause to believe, and I do believe, that BOUCHARD committed the offense of Assaulting a Federal Officer (Felony), in violation of 18 U.S.C. § 111(a)(l).")

misdemeanor as claimed by Judd.[6]   (In addition, although Judd cites additional Oregon cases in his chart that supposedly involved only misdemeanor charges for assaults on officers, based on a brief review of the docket for these cases, Judd's chart appears to include some inaccuracies—as at least two cases did involve felony charges, contrary to Judd's claims.[7])

Judd has accordingly shown no disparate treatment in the government's charging approaches.   He instead focuses on the way the government ultimately resolved some of the Oregon cases and contrasts it with the plea offer that the government recently transmitted to him. Doc. 138 at 9.  This presentation—which compares the government's initial plea offer to him with the government's final resolution in thirty-nine hand-picked Oregon cases (while excluding other comparable Oregon cases that have not resulted in similar resolutions) — "falls woefully short of demonstrating a consistent pattern of unequal administration of the law." *United States v. Bernal-Rojas*, 933 F.2d 97, 99 (1st Cir. 1991). In fact, the government's initial plea offer here rebuts any inference that that it has "refused to plea bargain with [Judd], yet regularly reached agreements with otherwise similarly situated defendants." *Ibid.*

In addition, others in the Oregon group listed by Judd faced (and eventually pled) to the same 18 U.S.C. § 111(b) charge as Judd – which is of course very difficult to square with Judd's overarching claim that the government is engaging in selective prosecution here based on a failure to offer Judd a misdemeanor or deferred resolution plea offer.  *See United States v. Jacob Michael*

---

[6] *United States v. Webb*, case no. 3:20-mj-00169 (D. Ore. July 27, 2020) Doc. 1-1 at 3 (explaining that "[u]nder § 111(a), simple assault is a misdemeanor; an assault involving physical contact with the victim or an intent to commit another felony is a felony" and then explaining the alleged facts, which involve physical contact).

[7] *See United States v. Wills*, case no. 3:20-cr-00296 (D. Ore. July 27, 2020) Doc. 6 (indictment for felony violation of 18 U.S.C. § 111(a)); *United States v. O'Donnell*, case no. 3:20-mj-00166 (D. Ore. July 27, 2020) Doc. 1-1 (affidavit in support of arrest warrant explaining that under § 111(a), an assault involving physical contact with the victim is a felony and later indicating probable cause to believe the defendant assaulted officer and "in so doing made physical contact with a federal officer").

*Gaines*, case no. 3:20-cr-00223 (D. Ore. filed July 16, 2020), Doc. 14 and Doc. 53 (plea agreement to violation of 18 U.S.C. § 111(b) for hitting Marshal with a hammer); *United States v. Dakotah Ray Horton,* case no. 3:20-cr-00419 (D. Ore. filed Aug. 16, 2020), Doc. 25 (plea agreement to violation of 18 U.S.C. § 111(b) for hitting Marshal with a bat).

Similarly, there are comparable Oregon cases *not* cited by Judd in his chart or in his motion that specifically involve allegations of lighting fireworks or some other pyrotechnic. Like Judd, each defendant's actions were captured on video. Like Judd, each defendant in those cases was charged with a felony as a result and the cases remain pending. *See United States v. Gabriel E. Agard-Berryhill,* case no. 3:20-cr-00352 (D. Ore. filed Aug. 19, 2020) (defendant charged with felony for allegedly lighting and throwing a firecracker at a federal building and causing a small fire); *United States v. Joseph Ybarra,* case no. 3:20-cr-00294 (D. Ore. filed Aug. 4, 2020) (defendant charged with felony for allegedly throwing a Molotov cocktail at a federal building, although bottle failed to ignite). In addition, although also not included in Judd's chart, other defendants in the Portland cases who were engaged in equally reckless and dangerous behavior were charged with (and pled) to felonies as a result. *See, e.g*., *United States v. Schinzing,* case no. 3:20-cr-00298 (D. Ore. filed Aug. 5, 2020) (defendant sentenced to 15 months of imprisonment after pleading guilty to felony arson for breaking into a corrections facility and setting fire to cubicle); *United States v. Weier*, case no. 3:20-cr-00263 (D. Ore. filed July 23, 2020) (defendant pled guilty to felony for unsuccessfully attempting to set fire to a courthouse by repositioning a piece of lit wood against the building). Again, like Judd, each of these two cases was captured on video.

More fundamentally, the thirty-nine Oregon cases serve as improper "comparator[s]" because those defendants and Judd are not similarly situated. *Stone*, 394 F. Supp. 3d at 31. Judd

spent hours with other rioters at the front lines of violent attempts to break into the Capitol building. He did so while elected lawmakers and the Vice President of the United States were present in the building and attempting to certify the results of the 2020 Presidential Election in accordance with Article II of the Constitution.  And he committed a host of federal offenses attendant to this riot, including lighting and throwing a firecracker at officers standing feet in front of him inside a packed small tunnel, helping to create a shield wall that was used by other rioters to smash up against officers inside that same small tunnel, and repeatedly joining heave-ho efforts with other rioters as they used all of their might as a group to try to collectively push through law enforcement officers in that same small tunnel.  All this was captured on multiple high-definition videos.

Contrast that with the thirty-nine Oregon defendants, who—despite committing serious offenses—never entered the federal courthouse structure, impeded an official proceeding, or were alleged to have engaged in repeated assaults on law enforcement officers spread out over a few hours.  Additionally, as noted above, the government's evidence in those Oregon cases that resulted in dismissal or deferred resolution agreements, often relied on officer recollections (*e.g.*, identifying the particular offender on a darkened plaza with throngs of people) that could be challenged at trial — rather than the multiple videos from different angles capturing Judd's actions in this case.[8]  (Similarly, far from being entirely captured on multiple videos, the one

---

[8] For example, the three cases flagged in Judd's motion do not appear to have been captured on video. *See United States v. Johnson*, case no. 3:20. 3:20-mj-00170 (D. Ore. July 27, 2020), Doc. No 1-1 (affidavit in support of arrest warrant explaining evidence based on testimony of officers involved and no mention of video); *United States v. Bouchard*, case no. 3:20-mj-00165 (D. Ore. July 24, 2020), Doc. 1-1 (same); *United States v. Bouchard*, case no. 3:20-mj-00165 (D. Ore. July 24, 2020), Doc. 1-1 (same).  Similarly, based on a brief review of some of the cases resulting in deferred resolution agreements that are mentioned in Judd's chart, they also appear to not involve cases captured on video.  *See, e.g.*, *United States v. Blank*, case no. 3:20-cr-00224 (D. Ore. July 26, 2020) Doc. 1-1 (affidavit in support of arrest warrant explaining evidence based on testimony of officers involved and no mention of video); *United States v. Storey*, case no. 3:20-cr-00330 (D. Ore. July 27, 2020) Doc. 1-1 (same); *United States v. Wills*, case no. 3:20-cr-00296 (D. Ore. July 27, 2020) Doc. 1-1 (same).

D.C. Superior Court case cited by Judd appears to have relied entirely on a brief observation by just one witness in the middle of an extremely hectic encounter. *See United States v. Alanna Rogers*, 2020 CF3 006970, Affidavit in Support of an Arrest Warrant.)

These situational and evidentiary differences represent "distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions" in Judd's case. *Branch Ministries*, 211 F.3d at 145 (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)); *see also Price v. U.S. Dep't of Justice*, 865 F.3d 676, 681 (D.C. Cir. 2017) (observing that a prosecutor may legitimately consider "concerns such as rehabilitation, allocation of criminal justice resources, the strength of the evidence against the defendant, and the extent of a defendant's cooperation" in plea negotiations) (brackets and citation omitted).

Multiple decisions from this jurisdiction and this Court have also documented the *sui generis* nature of this criminal conduct. The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir.). Indeed, this Court has noted the same. *See United States v. Timothy Lous Hale-Cusanelli*, 21-cr-37, (D.D.C. Mar 23, 2021) (Hrg. Tr. at 24) ("Obviously, the January 6th riot was a serious and *sui generis* threat to our country's body politic."). Other members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cha*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. Jun. 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26,

2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

These decisions confirm that the actions taken by Judd and others on January 6 differ in kind and in degree from the thirty-nine cited Oregon cases. Judd was part of a mob who traveled to the Capitol grounds, repeatedly attempted to breach the Capitol building with physical force, and repeatedly assaulted law enforcement with the goal of impeding congressional certification of the 2020 Presidential Election. Indeed, he is one of more than 600 defendants already charged for participating in the riot, and he does not suggest that he has been treated differently than any of those similarly situated defendants.

Judd's effort to draw comparisons to the thirty-nine Oregon cases (and one D.C. Superior Court case) accordingly fails. Lacking colorable evidence that the government singled him out for prosecution, Judd's discovery request fails at the first step.

**B. Judd has not made a colorable showing that the government harbored an improper motive in prosecuting him.**

With respect to the second prong, Judd has failed to adduce any evidence that improper motives undergird this prosecution.

Judd instead intimates that the government accepted favorable dispositions in some of the thirty-nine Oregon cases, but withheld a similar plea offer here because he espouses political views that the government disfavors. Doc. 138 at 157 ("[These dismissals and resolutions have occurred under the same Democratic administration that continues to prosecute Mr. Judd."). But Judd presents no evidence linking any Oregon defendant to a particular political viewpoint. For example, nothing in the affidavits in support of arrest for the three main Oregon cases described

in his motion include any evidence that those defendants ascribed to a particular political viewpoint.[9]

Stripped to its core, Judd relies on rank conjecture in suggesting that political favoritism has guided the government's charging and plea decisions. That is not enough to warrant discovery here; "a defendant must provide something more than mere speculation or 'personal conclusions'" of selective prosecution. *Stone*, 394 F. Supp. 3d at 31 (quoting *Armstrong*, 517 U.S. at 470).

At bottom, the government has determined that Judd's offense conduct warrants a penalty more significant than the Oregon defendants cited in his motion. That reflects an appropriate exercise of its prosecutorial discretion in balancing the seriousness of Judd's conduct, the strength of the evidence against him, the need for his rehabilitation, the need to deter him and others from future criminal activity targeting the electoral process, and the allocation of the government's resources. All these factors constitute permissible prosecutorial considerations. *See Price*, 865 F.3d at 681.

Judd has adduced no evidence that the government initiated these charges in response to his political views. The Acting U.S. Attorney for the District of Columbia—as an officer of this Court—further represents that such a consideration plays no role in his office's charging policies—be it in this investigation or elsewhere. Judd accordingly fails his burden on the second element.

---

[9] *See United States v. Johnson*, case no. 3:20. 3:20-mj-00170 (D. Ore. July 27, 2020), Doc. No 1-1 at 6 (Defendant "stated his reason for attending the protest was to make sure his friends get home safe"); *United States v. Bouchard,* case no. 3:20-mj-00165 (D. Ore. July 24, 2020), Doc. 1-1 (defendant made no statement about his intent other than to say "his intent was not to hurt anyone, but to 'stand his ground.'"); *United States v. Bouchard,* case no. 3:20-mj-00165 (D. Ore. July 24, 2020), Doc. 1-1 (defendant "stated that he comes out often to the protests because he supports the movement that the protest represents" with no further explanation provided).

## Conclusion

Because Judd has failed to carry his burden, he is not entitled to discovery on his

selective-prosecution claim and his motion should be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By: _____
    **MELISSA JACKSON**
    Assistant United States Attorney
    D.C Bar Number 996787
    United States Attorney's Office
    555 Fourth Street, N.W.
    Washington, D.C. 20530
    Telephone: (202) 815-8585
    Email: Melissa.Jackson@USDOJ.GOV

    JOCELYN BOND
    Assistant United States Attorney
    Email: Jocelyn.Bond@usdoj.gov
    KIMBERLEY C. NIELSEN
    Assistant United States Attorney
    Email: Kimberley.Nielsen@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2021, I caused a copy of the foregoing opposition to be served on counsel of record via electronic filing.

*/s/ Melissa Jackson*
Melissa Jackson
Assistant United States Attorney