## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**

**DAVID LEE JUDD,**

        **Defendant.**

**Crim. Action No. 1:21-CR-40 (TNM)**

## MR. JUDD'S MOTION TO DISMISS OBSTRUCTION CHARGE

David Lee Judd, through undersigned counsel, and pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v), hereby respectfully requests that the Court dismiss Count Thirty-Four of the Fifth Superseding Indictment, which charges him with obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2) & 2.

In Count 34, he Fifth Superseding Indictment alleges that, on or about January 6, 2021, in the District of Columbia and elsewhere, Mr. Judd

> attempted to, and did, corruptly obstruct, influence, and impede an official proceeding; that is, a proceeding before Congress, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College Vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

ECF 179.

The Court should dismiss Count Thirty-Four because it is fatally flawed for several reasons.

First, as Judge Nichols recently found in another January 6 case, the conduct Mr. Judd has been accused of committing cannot qualify as conduct that "otherwise

obstructs, influences, or impedes" an official proceeding, within the meaning of Section 1512(c)(2).[1] Second, 18 U.S.C. § 1512(c)(2) only prohibits the corrupt obstruction of tribunal-like proceedings before Congress related to the administration of justice. It does not prohibit the obstruction of a ceremonial proceeding before Congress like the certification of the electoral college vote. Thus Mr. Judd's alleged obstruction of the certification of the electoral college vote is not a crime under 18 U.S.C. § 1512(c). Third, Section 1512(c)(2) is unconstitutionally vague in that "corruptly" is undefined and itself vague.

For these reasons, and in light of the demands of the rule of lenity, Mr. Judd respectfully requests that the Court dismiss Count Thirty-Four.[2]

---

[1] *United States v. Miller*, 1:21-CR-119 (CJN), 2022 WL 823070 (D.D.C. March 7, 2022) [hereinafter "*Miller* mem. op."]. Judge Nichols's opinion is attached hereto as Ex. 1.

[2] The U.S. Supreme Court and the D.C. Circuit have not ruled on this issues. Mr. Judd, through undersigned counsel, recognizes that several of this Court's colleagues have recently denied motions to dismiss charges of obstruction under 18 U.S.C. § 1512(c)(2). *See* Memorandum Opinions in *United States v. Andries,* No. 1:21-CR-93 (RC), 2022 WL 768684 (D.D.C. March 14, 2022) [hereinafter *Andries* mem. op.]*; United States v. Sandlin, et al.*, No. 21-CR-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021) [hereinafter "*Sandlin* mem. op."]*; United States v. Caldwell et al.*, No. 21-CR-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021) [hereinafter "*Caldwell* mem. op."]; *United States v. Nordean, et al.,* No. 21-CR-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021) [hereinafter "*Nordean* mem. op."]; *United States v. Montgomery, et al.,* No. 21-CR-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021) [hereinafter "*Montgomery* mem. op."]; *United States v. Mostofsky*, No. 21-CR-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021) [hereinafter "*Mostofsky* mem. op."]; *United States v. McHugh*, 21-CR-453 (JDB), 2022 WL 296304 (D.D.C. Feb. 1, 2022).

However, in *United States v. Miller*, Judge Nichols dismissed the obstruction count concluding that "§1512(c)(2) must be interpreted as limited by subsection (c)(1), and thus requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Miller* mem. op. at 28.

## COUNT THIRTY-FOUR FAILS TO ALLEGE CONDUCT THAT "OTHERWISE OBSTRUCTS, INFLUENCES, OR IMPEDES ANY OFFICIAL PROCEEDING"

Count Thirty-Four fails to allege an *actus reus* that falls within 18 U.S.C. § 1512(c)(2). This is a separate ground for dismissal of Count Thirty-Four. *See Miller* mem. op. at 15 (dismissing obstruction count in a January 6 case where Indictment did not allege or imply that defendant Miller "took some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence Congress's certification of the electoral vote.").

Section 1512(c) of Title 18 provides:

> (c) Whoever corruptly—
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

Because Section 1512(c)(2) only prohibits "otherwise obstruct[ing], influenc[ing], or imped[ing] any official proceeding," only acts that fall within that clause violate the act. This is because the "otherwise" clause must be construed in light of 1512(c) as a whole, and the broader context for that provision. As Judge Nichols found in the attached opinion and as the Department of Justice's own Attorney General recently explained, Supreme Court case law demonstrates that this is so. Relying on *Begay v. United States*, 553 U.S. 137 (2008), and *Yates v. United States,* 574 U.S. 528 (2015), the former Attorney General explained:

3

> [I]t is clear that use of the word "otherwise" in the residual clause [of Section 1512(c)(2)] expressly links the clause to the forms of obstruction specifically defined elsewhere in the provision. Unless it serves that purpose, the word "otherwise" does no work at all and is mere surplusage. [An] interpretation of the residual clause as covering any and all acts that influence a proceeding reads the word "otherwise" out of the statute altogether. But any proper interpretation of the clause must give effect to the word "otherwise;" it must do some work.

Memorandum from William Barr to Deputy Attorney General Rod Rosenstein and Assistant Attorney General Steve Engel of June 8, 2018 [hereinafter "Barr Memo"] at 4 (emphasis omitted).[3] After discussing *Begay* and *Yates* and how those cases emphasized that "specific examples enumerated prior to the residual clause are typically read as refining or limiting in some way the broader catch-all term used in the residual clause," he continued,

> Consequently, under the statute's plain language and structure, the most natural and plausible reading of 1512(c)(2) is that it covers acts that have the same kind of obstructive impact as the listed forms of obstruction — *i.e.*, impairing the availability or integrity of evidence — but cause this impairment in a different way than the enumerated actions do. Under this construction, then, the "catch all" language in clause (c)(2) encompasses any conduct, even if not specifically described in 1512, that is directed at undermining a proceeding's truth-finding function *through actions impairing the integrity and availability of evidence.*

*Id.* at 4-5 (emphasis omitted) (emphasis added).[4]

---

[3] This is available at https://s3.documentcloud.org/documents/5638848/June-2018-Barr-Memo-to-DOJ-Muellers-Obstruction.pdf (last visited April 4, 2022).

[4] Although *Yates* was a plurality opinion, Justice Alito's concurring opinion also supports the former Attorney General's and Mr. Judd's position. According to Justice Alito, the statute's list of nouns, its list of verbs, and its title all stood out as showing that the statute in question did not reach the conduct of the defendant in that case. *Yates*, 574 U.S. at 549 (Alito, J., concurring). Regarding the nouns, Justice Alito considered the application of both *noscitur a sociis* and *ejusdem generis* to find that the term "tangible object" should refer to "something similar to records or documents."

The former Attorney General noted that case law reflects this application of the residual clause as only applying to "attempts to interfere with, or render false, evidence that would become available to a proceeding" or "to prevent the flow of evidence to a proceeding." *Id.* at 5 (citing *United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) (soliciting tips from corrupt cops to evade surveillance); *United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation); *see also e.g. United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (involving false testimony to a grand jury); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014) (involving intentional false statements to court during a preliminary injunction hearing); *United States v. Lucas*, 499 F.3d 769, 780–81 (8th Cir. 2007) (involving a defendant having others falsely claim ownership of a firearm); *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007) (involving defendant's "attempt[s] to orchestrate" grand jury witness's testimony by sending notes to an attorney who in turn "coached" the witness); *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (involving false statements in a court proceeding); *United States v. Pugh*, 945 F.3d 9, 28 (2d Cir. 2019) (involving

---

*Id.* at 549–50. In this case, Section 1512(c)(1) refers to "a record, document, or other object." There is no allegation that Mr. Judd interfered with any such item, much less any evidence. Justice Alito then looked at the verbs and noticed some glaring problems trying to apply those verbs to any tangible object. *Id.* at 551 ("How does one make a false entry in a fish?"). Because there was no evidence interfered with by Judd (nor will there ever be), the verbs in Section 1512(c) have no object to reference. Finally, Justice Alito pointed to the title of the statute: "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy" and noted "This too points toward filekeeping, not fish." *Id.* at 552 (emphasis added). As Mr. Judd has already addressed above, the title of Section 1512 clearly supports a finding that it was not intended to apply to all forms of obstructive conduct.

destruction of several USB drives and deletion of data); *see also United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (involving providing false answers to interrogatories in a civil law suit filed by a person seeking damages for mistreatment while in police custody, explaining that §1512(c)(1) "covers obstructive conduct in the form of physical destruction of documents and records" whereas § 1512(c)(2) covers "otherwise" obstructive behavior to include giving false statements in interrogatories relating to a civil law suit). As the former Attorney General correctly observed, "the natural and plausible reading of 1512(c)(2)" requires some conduct that impairs the integrity and availability of some *evidence.*

This is entirely consistent with the legislative history of Section 1512(c)(2) as noted by the former Attorney General and Judge Nichols in *Miller. See Miller* mem. op. at 23. Section 1512(c) was passed as part of the Sarbanes-Oxley Act of 2002, "[a]n Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." SARBANES-OXLEY ACT OF 2002, Pub. L. No. 107-204, 116 Stat. 745. Subsection (c) was added in part to ensure that there would be liability for those who destroyed records before an "official proceeding" had convened even if they did not foresee one convening (so long as their intent is to ensure that the records would be unavailable), and even if they acted alone (rather than caused others to act in ways that obstructed justice), largely in reaction to Arthur Andersen LLP having evaded criminal liability for destroying

documents in the wake of the Enron scandal under Section 1512(b)(2), because that section only criminalized actions directed at another person.[5]

The Senate Judiciary Committee report described the Act's purpose as "provid[ing] for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations." S. REP. NO. 107-146, at 2 (2002). The Committee Report noted that much of Arthur Andersen's document destruction was "undertaken in anticipation of a SEC subpoena to Andersen for its auditing and consulting work related to Enron." *Id.* at 4. Congress was adamant that "[w]hen a person destroys evidence with the intent of obstructing any type of investigation and the matter is within the jurisdiction of a federal agency, overly technical legal distinctions should neither hinder nor prevent prosecution and punishment." *Id.* at 6-7. Thus, the legislative history of Section 1512(c)(2) "was expressly designed to 'clarify and close loopholes in the existing criminal laws *relating to the destruction or fabrication of evidence* and the preservation of financial and audit records.'" Barr Memo at 5-6 (quoting S. REP. NO. 107-146, at 14-15) (emphasis added). As Judge Nichols put it, "in the wake of the Enron scandal, Congress was faced with a very specific loophole: that then-existing criminal statutes made it illegal to case or induce another person to destroy documents, but it did not make it illegal to do by oneself. Congress closed that loop by passing subsection (c), and *nothing in the legislative history suggest a broader*

---

[5] *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-07 (2005).

*purpose than that." Miller* mem. op. at 28 (emphasis added). Likewise, the former Attorney General also observed that "[r]eading the residual clause as an all-encompassing proscription cannot be reconciled either with the other subsections of § 1512, or with the other obstruction provisions in Title 18 that must be read in *pari passu* with those in § 1512." Barr Memo at 5.

If this Court were to interpret Section 1512(c)(2) as the government wants it to — as an all-encompassing catch-all to include something so unique as protesting the election certification proceedings — "clause (c)(2) would render all the specific terms in clause (c)(1) surplusage; moreover, it would swallow up all the specific prohibitions in the remainder of § 1512 — subsections (a), (b), and (d)." *Id.* And, as Mr. Barr continued, "[m]ore than that, it would subsume virtually all other obstruction provisions in Title 18. . . . It is not too much of an exaggeration to say that, if § 1512(c)(2) can be read as broadly as being proposed, then virtually all Federal obstruction law could be reduced to this single clause." *Id.*; *see also Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

In sum, the canons of construction employed by the Court in *Begay* and *Yates*, the text, structure, and the practical application of Section 1512(c)(2) as demonstrated in caselaw, as well as its legislative history all support a holding that the "otherwise" clause in Section 1512(c)(2) must be construed in a similar vein to the terms that are in clause one. Thus, in order for Count Thirty-Four to sufficiently

allege a violation, it must allege that Mr. Judd took "some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding." *Miller* mem. op. at 28. Because no such allegation exists in the Indictment here (nor can there ever be one), this Court should adopt the reasoning applied by Judge Nichols in *Miller* and dismiss Count Thirty-Four of the Indictment alleging a violation of Section1512(c)(2).

## THE CERTIFICATION OF THE ELECTORAL VOTE WAS NOT AN "OFFICIAL PROCEEDING"

**I.      Section 1512(c)(2) prohibits obstructing only "official proceedings," which are tribunal-like proceedings relating to the administration of justice.**

Congress defined the term "official proceeding" for purposes of Sections 1512 and 1513 in Section 1515(a)(1), as follows:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) a proceeding before the Congress;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

The language of the statute suggests that the term "official proceeding" refers to tribunal-like proceedings relating to adjudication, deliberation, and the administration

of justice, all features which the electoral count lacks. As such, though the counting of the electoral vote takes place in Congress, it is not an "official proceeding."

A.   *The text in and around Sections 1515 and 1512 support this view.*

This Court recently examined the qualities of an "official proceeding," holding that the "plain meaning of § 1512(c)(2) and § 1515(a)(1)(A) is unambiguous—an informal, routine agency action like clearance-adjudication does not fall within the statutory definition of an "official proceeding." *U.S v. Guertin*, 1:21-CR-262 (TNM), 2022 WL 203467 (D.D.C. Jan. 24, 2022) at *5. Instead, this Court found that an "official proceeding" must "resemble a formal tribunal." *Id.* at *6. By the rationale applied by this Court in *Guertin*, the electoral count likewise does not qualify as an "official proceeding."

In *Guertin*, this Court began by noting that "official proceeding" can have a broad or narrow definition. This Court found for good reason that the narrow definition must be applied.  *Id.* at *5. The Court then went on to analyze the text of the 1512(c)(2), observing that "official" appears before "proceeding," thus "textually limiting covered proceedings to those bearing indicia of officiality." *Id* at *7.  Next, the Court found that the definitional provisions in 1515(a)(1) support that reading, observing that the "word 'before' suggests an 'official proceeding' would typically entail convening a formal tribunal or adjudicative body before which parties are compelled to appear." *Id.* (internal citations omitted) (emphasis omitted). After careful textual analysis, this Court held that taken together, Sections 1515(a)(1) and 1512 make clear that a covered "proceeding before a Federal government agency" must resemble a formal tribunal." *Id.  See also United States v. Ermoian*, 752 F.3d 1165,

1172 (9th Cir. 2013) (analyzing the text in and surrounding Sections 1515 and 1512 to determine that the phrase "a proceeding before a Federal Government agency which is authorized by law" in Section 1515(a)(1)(C) does *not* include FBI investigations); *United States v. Ramos,* 537 F.3d 439, 462–63 (5th Cir. 2008) (stating that "use[ of] the preposition 'before' in connection with the term 'Federal Government agency' . . . implies that an 'official proceeding' involves some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency."). The foregoing analysis demonstrates that Section 1515(a)(1)(B) does not include the counting of electoral votes.

B.   *The electoral count is not an official proceeding because it is a ceremonial event.*

Just as the "criminal investigation" in *Ermoian* and the "routine certification" in *Guertin* did not meet the definition of an "official proceeding" under the obstruction of justice statute with the full context in mind, neither do the election certification proceedings meet that same definition here. Indeed, when considering Congress's role in counting electoral votes pursuant to the 12th Amendment and the Electoral Count Act of of 1887, later codified in 3 U.S.C. § 15, it is clear that the electoral count is a ceremonial and administrative event, bearing no resemblance to a tribunal.The Twelfth Amendment and 3 U.S.C. § 15 place responsibility on Congress to count electoral votes *after* the states have already heard disputes and certified the vote. *See Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rhenquist, J. concurring) (the "State's selection of electors shall be conclusive, and shall govern in the counting of the electoral votes."). The Joint Session does not have the power under the Constitution to actually

reject the votes of any State. *See* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?,* 80 N.C. L. REV. 1653, 1709 (2002) [hereinafter Kesavan].

Thus, though the election certification proceedings may be "official," no one is "before" the Congress in those proceedings; the proceedings entail no formal investigation or consideration of facts; and there is little to no discretion on the part of the Joint Session of Congress and its Presiding Officer. No parties are summoned to attend the proceedings; no witness or evidence is produced, offered or taken; and nothing is adjudicated by Congress. As such, the certification proceedings are nothing like tribunal proceedings, and have nothing in common with the "business done in courts," or acts "done by the authority or direction of the court, express or implied." *See Ermoian,*752 F.3d at 1170 ("'Proceeding' is a word much used to express the business done in courts and "is an act done by the authority or direction of the court, express or implied.") (quoting Black's Law Dictionary commentary, cited *supra*). Instead, the vote count is entirely ministerial and ceremonial.

The history of "objections" lodged at the Electoral Count further demonstrate the ceremonial nature of the electoral count. The past objections were mostly made in the 1800's because of the confusion of when new states were admitted to the union and how that impacted whether their votes should count. Objections were ultimately rejected because it was determined that the Joint Session did not have the authority to judge the proceedings already had in the states. *See* Kesavan ,*supra* at 1678-94. In 1876, the most tumultuous American election thus far, Samuel Tilden and Rutherford Hayes were separated by one electoral vote and four states sent Congress

multiple electoral returns. *Id.* Instead of the Joint Session resolving this issue (because Congress recognized that the Joint Session did not have the authority to do so), Congress formed a separate commission to sort through the chaos and decide the issues of fact and law presented. *Id.* Subsequently, to address issues like this in the future, Congress enacted the Electoral Count Act of 1887, placing on the states the responsibility to resolve disputes about electors and their appointments and certifications. Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLA. L. REV. 540, 543 (July 2004).

In 1969, there was an objection that a vote sent up to Congress from North Carolina should not be counted because it reflected the "faithless" elector who had refused to give his vote to Richard Nixon, despite Nixon winning the popular vote in that state. The objection was rejected, and the vote at issue counted, because of the strong reminder of representatives such as R. Rarick who said:

> We are not election supervisors nor given the discretion to re-compute the vote received from a sovereign state. The Constitution clearly proscribes our duty as to 'count the electoral votes,' the ***ministerial*** function of a central collecting agency and a tabulating point.

*See* Kesavan, *supra* at 1694, 2022 (emphasis added).

For all these reasons, the Electoral Count is not "a proceeding" akin to a formal hearing and it is not "tribune-like,' as this Court found to be required in *Guertin*. Rather, it is a ceremonial meeting of both houses of Congress. While steeped in tradition, it decides nothing. It is a political performance conducted in order to give the country a feeling of finality over the already final election results. As a result, the

Electoral Count is not an "official proceeding" and count Thirty-Four of the Indictment should be dismissed.

### SECTION 1512(C)(2) IS UNCONSTITUTIONALLY VAGUE BECAUSE "CORRUPTLY" IS VAGUE

The Court should dismiss the Indictment for a third and related reason, which is that Section 1512(c)(2) as applied to Congressional proceedings fails to provide constitutionally required notice of what the statute prohibits, because the contextual meaning of "corruptly" is vague. In the alternative, the only construction of "corruptly" that might enable the statute to pass constitutional muster is acting with the intent to obtain an unlawful advantage for oneself or an associate contrary to the due administration of justice. But because the Indictment against Mr. Judd fails to allege anything relating to the administration of justice, the Court should dismiss in any case.

In order to comply with the requirements of due process, a statute must give fair warning of the prohibited conduct. *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964). A statute is unconstitutionally vague under the due process clause if "it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595–96 (2015); *see also Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983) ("[A] penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries ... pursue their personal predilections.'"); *Connally v. General Construction*

*Company*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."). The allegations against Mr. Judd in Count Thirty-Four of the Indictment fail in both respects.

## I.    "Corruptly," as used in Section 1512(c)(2), is unconstitutionally vague.

In *United States v. Poindexter,* 951 F.2d 369 (D.C. Cir. 1991) the Court of Appeals for this Circuit ruled that the word "corruptly" is prone to causing vagueness in a case concerning Section 1505, which criminalizes

> [w]hoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress –

18 U.S.C. § 1505.

Congress later added the definition of "corruptly" now applicable to the statute via Section 1515(b)), but in *Poindexter*, the court analyzed the text without that context. The court stated that the word "corruptly" in the text "must have some meaning, because otherwise the statute would criminalize all attempts to 'influence' congressional [proceedings] – an absurd result that Congress could not have intended in enacting the statute." *Poindexter*, 951 F.2d at 377 (analyzing application of § 1505 as applied to making false statements to Congress).

15

> The court also found that dictionary alone did not make clear what that meaning is. First, there are several dictionary definitions:"[C]orruptly" is the adverbial form of the adjective "corrupt," which means "depraved, evil: perverted into a state of moral weakness or wickedness . . . of debased political morality; characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements." A "corrupt" intent may also be defined as "the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others."

*Id.* at 378 (quoting *United States v. North*, 910 F. 2d 843, 881-82 (D.C. Cir. 1990)). Poindexter argued that, "so defined, 'corruptly' is vague as used in section 1505." *Id.* at 1378. Mr. Judd argues that, so defined, "corruptly" as used in Section 1512 is as well.

The Court of Appeals acknowledged, and this Court must as well, that "on its face, the word 'corruptly' is vague; that is, in the absence of some narrowing gloss, people must 'guess at its meaning and differ as to its application.'" *Id.* at 378. And, just as the court found that "corruptly influencing" a congressional inquiry "does not at all clearly encompass lying to Congress, which is, by way of contrast, clearly a violation of § 1001," *id.*, this Court must acknowledge that the conduct alleged in the instant Indictment – which also would clearly violate another statute (40 U.S.C. § 5104) – does not clearly fall within "corruptly . . . otherwise obstructing, influencing, or impeding" an official proceeding, using the dictionary definitions of "corruptly." That is because "[t]he various dictionary definitions of the adjective 'corrupt'" are themselves vague. *Id.* "Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific – indeed they may be less specific – than 'corrupt.'" *Id.* at 378-79. Because of this, the Court of Appeals for this Circuit found the word "corruptly" as

used in Section 1505 "too vague to provide constitutionally adequate notice that it prohibits lying to the Congress." *Id*. at 379.

Applying the logic of *Poindexter*, the only way the use of the word in Section 1512 can avoid the same fate is if the text or other context "clearly indicates a more specific meaning of the term 'corruptly,'" and Mr. Judd's "conduct comes within that meaning." *Id*. at 379 (considering whether the use of the word, the legislative history of 1505, or judicial gloss on the statute provided a clear indication of a more specific meaning of the word in that statute, and ultimately concluding that it did not).

In *Poindexter*, the court first considered whether the usage of the word "corruptly" gave it more definition. *Id*. at 379. The court noted;

> the verb "corrupt" may be used transitively ("A corrupts B," i.e., "A causes B to act corruptly") or intransitively ("A corrupts," i.e., "A becomes corrupt, depraved, impure, etc."). So too, the adverbial form "corruptly" may have either the transitive or the intransitive sense. *See* 3 Oxford English Dictionary 974 (2d ed. 1989) ("corruptly" may mean either "by means of corruption or bribery," i.e., by means of corrupting another, or acting oneself "in a corrupt or depraved manner").

> *Id*. at 379. But the court found that this analysis did not evade the vagueness in the word itself because either a transitive or an intransitive interpretation would still be unconstitutionally vague . . . if specific content is not given to the word 'corruptly.' Reading 'corruptly' to prohibit one from influencing another to act 'immorally' or 'improperly' provides no more guidance than does reading it to prohibit one from acting 'immorally' or 'improperly' oneself.

*Id*.

The same issue is presented here: No matter how "corruptly" is used in Section 1512(c)(2) – transitively or intransitively – the word lacks definition and remains too vague to provide constitutionally-required notice.

II.   **The emerging definitions of "corruptly" in this District demonstrate how vague the term is.**

This Court's colleagues do not disagree that, in the abstract, "corruptly" is somewhat vague, and acknowledge that many of words often used to define it are of little help. *See, e.g., Sandlin* mem. op. at *12 ("But defining 'corruptly' to involve 'wrongfulness' presents a closer question because it may be subject to the same infirmities that *Poindexter* found in the words 'immoral' and 'improper'.") (citing *Poindexter*, 951 F.2d 369, 379 (D.C. Cir. 1991); *Caldwell* mem. op. at 19 (noting that *Poindexter* provided that "'the word 'corruptly' is vague" and that, "in absence of some narrowing gloss, people must 'guess at its meaning and differ as to its application'"); *Mostofsy* mem. op. at 21 (adopting reasoning of both *Sandlin* mem. op. and *Caldwell* mem. op.).

These other courts have found that that judicial gloss provides further, and sufficient, definition to the word "corruptly." But they do not agree on what that gloss provides. All appear to agree that "corruptly" requires proof of intent to obstruct an official proceeding, and that there must be some nexus, a relationship in time, causation, or logic, between the defendant's actions and the official proceeding in question. But they do not all agree on the rest of the definition of "corruptly," or arrive at their conclusion exactly the same way.

Judge Friedrich appears to conclude that judicial gloss provides notice that proof that a defendant acted "corruptly" also must include proof that he acted "wrongfully." *Sandlin* mem. op. at *11-13. The court finds that "in considering the meaning of "corruptly" (or wrongfully), courts have drawn a clear distinction between

lawful and unlawful conduct," drawing "a line that is consistent with the definition of 'wrongful': that is contrary to law, statute, or established rule." *Id.* at \*12 (internal citations omitted). This meaning, and judicial opinions, according to this court, "identify a core set of conduct against which § 1512(c)(2) may be constitutionally applied – 'independently criminal' conduct . . . that is 'inherently malign'," in addition to being intended to obstruct a proceeding with which it has a nexus. *Id.* at \*13. Thus, Judge Friedrich concludes that the statute is not vague as applied against the defendants accused of illegal conduct intended to obstruct an official proceeding, at least so long as it is inherently malign. *Id.* It appears that Judge Friedrich allows that more conduct may fall within the definition of "corrupt," but the court has declined to determine its outer limits. *Id.*

In the *Nordean* case, Judge Kelly appears to follow the logic of *Sandlin*, concluding that corruptly means at least "intentionally" and "wrongfully" and that the defendants in that case are alleged to have so-acted because they allegedly used "unlawful means." *Nordean* mem. op. at \*10. However, Judge Kelly seems to be more open to the notion that unlawful purposes, as opposed to unlawful means (such as breaking the law) can satisfy the "wrongfulness" prong perceived as a limitation on the meaning of "corrupt" in section 1512(c)(2). *Nordean* mem. op. at \*11.

Judge Boasberg also closely follows Judge Friedrich's rationale, in *Mostofsky*. However, that court interprets *Sandlin* to stand for the proposition that "corruptly" *requires* "that defendants acted '*unlawfully*, and with the intent to obstruct[,]'

impede, or influence an official proceeding." *Mostofsky* mem. op. at *11 (emphasis added) (alteration in original).

Judge Mehta takes yet another view of what the judicial gloss provides. In *Caldwell,* Judge Mehta concludes that case law provides notice that "corrupt" action involves "consciousness of wrongdoing" undertaken with specific intent to obstruct a congressional proceeding. *Caldwell* mem. op. at *10-11. But apparently not all conscious wrongdoing suffices, per this opinion: whereas preplanning to obstruct, wearing paramilitary gear, forcible trespass and assault, and coordinated movement through the Capitol would apparently qualify, "mere . . . trespass" apparently would not. *Id*. at *13. Thus, Judge Mehta perceives an extra limitation on what it means to act corruptly (*i.e.*, it includes consciously violating crimes at least more serious than trespass), just as Judge Friedrich's did (*i.e.*, it includes conduct that is both unlawful and "inherently malign").

In *Montgomery*, Judge Moss appears to track Judge Mehta's reasoning, finding that case law preceding and following *Poindexter* provides notice that, to prove a defendant acted corruptly, the government must establish intent to obstruct an official proceeding, and "consciousness of wrongdoing." *Montgomery* mem. op. at *20-21. However, Judge Moss allows that there could be further requirements, including proof that the defendant used "some unlawful method" and acted "with the hope or expectation of a benefit to oneself or a benefit to another person." *Id.* at *22 n.5 (internal citations omitted)).

These various spins on just what it means to act "corruptly" under Section 1512(c)(2) demonstrate that the defendants in all of these cases are right that the law was *not* so clear about what "corruptly" means, and that neither the text nor the judicial gloss on it provided them with sufficient notice that it could be applied against their conduct.

## THE RULE OF LENITY PROVIDES CONFIRMATION THAT THE COURT SHOULD DISMISS COUNT THIRTY-FOUR

Finally, if recourse to any of the "traditional tools of statutory construction leaves any doubt" about the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress," as those terms are used in Section 1512(c)(2), this Court could also invoke the rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547-48 (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000), in turn quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). As it was in *Yates*, "[t]hat interpretative principle is relevant here, where the Government urges a reading of [Section 1512(c)(2)] that exposes individuals to 20-year prison sentences" for obstructing any proceeding before Congress in any manner that it deems "corrupt." *Id.* (citing *Liparota v. United States*, 471 U.S. 419, 427 (1985)) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

"In determining the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress," as those terms are used in Section 1512, as

it was for the Court in interpreting Section 1519 in *Yates*, it would also be "appropriate, before [choosing] the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Id*. (quoting *Cleveland*, 531 U.S. at 25, in turn quoting *United States v. Universal C.I.T. Credit Corp*., 344 U.S. 218, 222 (1952)). Because Congress failed to do so, and the government has accused Mr. Judd such that it is not "clear and definite" that his conduct violates Section 1512(c)(2), this Court should dismiss Count One of the Indictment against him.

## CONCLUSION

For all of these reasons, and such others as may be advanced in further briefing on this motion, and a hearing on this matter, Mr. Judd respectfully requests that the Court dismiss Count Thirty-Four of the Fifth Superseding Indictment.

Respectfully Submitted,

**DAVID JUDD**

by counsel:

A.J. Kramer
Federal Public Defender for the
District of Columbia

by:_____s/_____
ELIZABETH A. MULLIN
DC Bar No. 484020

Assistant Federal Public Defender
elizabeth_mullin@fd.org

_____/s/_____
EDWARD J. UNGVARSKY
DC Bar No. 459034
Ungvarsky Law, PLLC
114 N. Alfred Street
Alexandria, VA 22314
(571) 207-9710
ed@ungvarskylaw.com