**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-40-TNM-3** |
| **DAVID LEE JUDD** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence David Lee Judd to 90 months of incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment of $200. Such a sentence would be towards the lower end of the government's requested calculation of Judd's Sentencing Guidelines range of 87-108 months and would appropriately balance the factors articulated in 18 U.S.C. § 3553, while also fully acknowledging the complexities of defendant[1] Judd's participation in the violent attack on the United States Capitol.

## I.     INTRODUCTION

On January 6, 2021, thousands of rioters stormed the U.S. Capitol. The rioters came with varying intentions and fulfilled their means with a range of actions. The presence of each individual rioter contributed to the chaos of the day, helped to outnumber police officers who were guarding the

---

[1] Throughout this memorandum, we use "the defendant" and "Judd" interchangeably.

Capitol, and ultimately halted the peaceful transition of Presidential power. Each rioter uniquely contributed as well. Some were leaders. Some were followers. Many fell somewhere along that continuum.

David Lee Judd was a leader. He was an instigator, a coordinator, an encourager, and a relentless participant. For nearly an hour and a half at and around the Lower West Terrace tunnel— the epicenter of violence on January 6, 2021—Judd assumed a role of responsibility. He acted as an on-the-ground commander of other rioters, directing, encouraging, and instigating the violence, chaos, and destruction in and around the tunnel as those rioters attempted to breach the line of police officers and enter the Capitol building. Judd spent over an hour using hand gestures to direct rioters into the tunnel, yelling commands to organize rioters, passing items into the tunnel to be used as weapons, assisting rioters exiting the tunnel by washing chemical irritant from their faces, pumping his fist in the air, and providing encouragement to rioters joining the chaos inside the tunnel.

When Judd felt like his coaching and organizing wasn't enough, he joined the efforts to attack police officers. Judd entered the tunnel several times and joined the mob's efforts to break through the police line using coordinated pushes. When pushing did not work, Judd lit a firecracker and threw it at the police line – landing near at least ten police officers. Judd then brazenly turned and walked out of the tunnel. From there, he did not skip a beat and continued directing rioter traffic inside and around the tunnel for another hour. Finally, the police line gained ground in the tunnel and successfully pushed the rioters out. Still nearby, Judd relentlessly joined the mob for his final effort to collectively push against the line of officers guarding the tunnel.

2

Defendant Judd's conduct in the assault on law enforcement on January 6, 2021 directly endangered numerous officers and gave momentum to a violent mob seeking to interrupt the certification of the 2020 Electoral College vote. His encouragement and direction to other rioters heightened the danger to those officers, more than a hundred of whom were injured over the day, and substantially delayed the certification of the Electoral College vote on January 6, 2021.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack On The Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 433, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      David Judd's Violent And Prolonged Participation And Leadership In The Lower West Terrace Tunnel

Before January 6, 2021, Judd made a posting on the Internet, seeking to find a ride to Washington, D.C. to "fight to Save this Country." Judd found someone to drive him from his home in Northern Texas to Washington, D.C. on January 5, 2021. On January 6, 2021, after attending the former president's "Stop the Steal" rally, Judd joined the crowd of rioters and walked to the West Front of the U.S. Capitol. At about 2:43 p.m., Judd climbed a set of stairs on the Northwest side of the inaugural platform to reach the Lower West Terrace (LWT). At the time, the scene was chaotic. The growing crowd was angry and aggressive and quickly started to outnumber police officers struggling to hold the mob back from encroaching on the Capitol. Police had deployed pepper spray and flash bang devices against the mob. Undeterred, many rioters began confronting police officers

3

and initiating violent altercations. Rather than leave the area, Judd made his way to LWT tunnel, the prominent doorway at the center of the Capitol building on the West front. From that point forward, Judd sought to advance the mob's progress into the building in an effort to achieve his objective of halting the certification of the Electoral College vote.

Judd arrived near the Lower West Terrace "tunnel" around 2:52 p.m. The tunnel is a stairway that had been converted into a narrow entryway due to construction of the temporary inaugural platform on the Lower West Terrace of the Capitol building. At the tunnel, a large group of rioters armed with their bodies and a variety of weapons (including batons, shields, an audio speaker, poles, a crutch, chemical irritants, and, in Judd's case, a firecracker) battled for several hours to enter the U.S. Capitol through the prominent tunnel entrance.



***Figures 1 & 2:*** *The "tunnel" as seen on CCTV footage prior to rioters entering, left, and from the outside perspective, right*

Easily visible in videos and photos from January 6, 2021, Judd had curly yellow hair and wore a red "Make America Great Again" baseball hat (at times), black hoodie, grey vest, and blue gloves (at times). As soon as he arrived at the tunnel, Judd became a key player in the tunnel attack.

Judd approached the tunnel as rioter David Mehaffie was waiving rioters into the tunnel and other rioters were passing shields into the tunnel. Judd entered the tunnel at about 2:56 p.m. As he approached the mouth of the tunnel, Judd turned toward the crowd, raised both of his arms, and encouragingly waved rioters to follow him.



*Figure 3: Screenshot of Capitol surveillance footage showing Judd (red square) waving rioters into the tunnel*



*Figure 4: Screenshot of Capitol surveillance footage showing Judd (red square) directing rioters into the tunnel*

Judd made his way to the middle of the pack of rioters inside the tunnel and joined as the rioters rocked back and forth in unison, thrusting their collective body weight to exert maximal force against the police line. Rioters yelled "HEAVE HO!" to coordinate the group's effort.



*Figure 5:* *Screenshot of Capitol surveillance footage showing Judd (red square) entering the tunnel before he made his way to the middle of the mob of rioters and joined the "HEAVE HO" pushes*

After joining several collective pushes, Judd moved to the mouth of the tunnel and stood nearby defendant Mehaffie. While Mehaffie directed rioter traffic from his perch on the exterior of the wooden archway at the tunnel's entrance, Judd directed traffic on the ground.



***Figure 6:*** *Screenshot of Capitol surveillance footage showing Judd (red square) waving rioters into the tunnel and defendant Mehaffie directing rioters from above (yellow arrow)*



***Figure 7:*** *Screenshot of Capitol surveillance footage showing Judd (red square) waving rioters into the tunnel and defendant Mehaffie directing rioters from above (yellow arrow)*

After directing rioters into the tunnel, Judd moved to the center of the tunnel archway and pumped his fist in the air. Judd turned to the rioters outside the tunnel and yelled "SHIELD WALL!" The mob of rioters responded to the call and passed stolen police shields toward the tunnel. Judd helped to receive the shields and pass them into the tunnel.



*Figures 8 & 9: Screenshots of surveillance footage and open-source footage showing Judd (red square/circle) chanting "SHIELD WALL!" and passing shields into the tunnel*



*Figure 10: Screenshot of surveillance footage showing Judd (red square) passing a shield into the tunnel*

At about 3:12 p.m., Judd re-entered the tunnel. He moved to the middle of the pack of rioters, not far from the police officers on the other side of the battle.

8



*Figure 11: Screenshot of Capitol surveillance footage showing Judd (red square)
inside the tunnel for the second time*

As the rioters violently thrusted their collective body weight into the officers, one officer could

be heard screaming in agonizing pain as he was smashed between a shield and a metal door frame.



*Figure 12: Screenshot of open-source footage showing USCP Officer D.H. screaming
in pain as he was smashed between a shield and a doorframe as the rioters collectively pushed*

In this time of utter chaos, Judd decided to elevate the attack on the police line. Once Judd

reached the midpoint of the tunnel, close to where the police line stood, Judd lit a firecracker (that he

claims to have found on the ground), raised his head to face the officers, and threw the firecracker

directly at the police line.



***Figures 13, 14, & 15 (left to right):*** *Screenshots of Capitol surveillance footage showing Judd lighting a firecracker and throwing it at police officers*



***Figure 16:*** *Screenshot of Capitol surveillance footage showing firecracker flying in the air toward police officers*

After throwing the firecracker at police officers, Judd immediately turned around and walked to the mouth of the tunnel. A rioter standing nearby yelled, "You going to do that and run away? What the fuck?!" One rioter asked what happened. Another answered, "He threw a firecracker, a big giant one, what the . . . ."

At the mouth of the tunnel, Judd immediately resumed waving more rioters into the tunnel.



*Figure 17: Screenshot of Capitol surveillance footage showing Judd (red square) waving more rioters into the tunnel*

Shortly after, Judd peered inside the tunnel as the rioters coordinated group pushes against the police line. Judd then turned to the crowd outside the tunnel and emphatically pumped his fist in the air.



*Figure 18: Screenshot of Capitol surveillance footage showing Judd (red square) watching as rioters collectively used their body weight to thrust into officers while chanting "HEAVE HO!"*



*Figure 19:* Screenshot of Capitol surveillance footage showing Judd (red square)
emphatically pumping his fist in the air, encouraging the mob

By 3:16 p.m., and for the next hour, as rioters continued to battle officers inside the tunnel in attempt to gain access into the Capitol building, Judd remained nearby waving rioters into the tunnel, helping rioters rinse chemical irritant from their eyes, and encouraging rioters in the tunnel.



*Figure 20:* Screenshot of Capitol surveillance footage showing Judd (red square)
waving rioters into the tunnel



***Figure 21:*** *Screenshot of open-source footage showing Judd (red square)*
*standing outside the tunnel*

At about 4:14 p.m., Judd watched as another rioter aggressively threw a long projectile at

officers inside the tunnel. Moments later, Judd triumphantly waved an American flag in the air.



***Figures 22 & 23 (left to right):*** *Screenshots of open-source footage showing rioter throwing projectile at officers*
*(yellow rectangle), left, and Judd waiving American flag (red square), right*

Eventually, officers temporarily gained control and pushed rioters to the mouth of the tunnel. Unwilling to relent, Judd, for the third time, joined rioters in collectively pushing into the police line to regain ground while rioters chanted, "PUSH!"



***Figure 24:*** *Screenshot of Capitol surveillance footage showing Judd (red square) joining rioters to collectively push against officers in the tunnel*

Long after police officers cleared most of the rioters from the Lower West Terrace and surrounding Capitol grounds, Judd remained. Judd was one of the very last rioters escorted off Capitol grounds on January 6.



***Figure 25:*** *Screenshot of open-source footage showing Judd as he's being corralled off restricted grounds by police officers*

14

### C.    The Impact Of Another Firecracker On Officers In The LWT Tunnel

A little more than an hour and a half after Judd threw his firecracker into the LWT tunnel, at approximately 4:47 p.m., another individual threw a similar object at the same location. This item, which appeared to be similar in size to Judd's firecracker, exploded in the tunnel.



***Figure 26:*** *Screenshot of Capitol surveillance footage showing lit firecracker (red circle) flying in the air toward police officers*



***Figure 27:*** *Screenshot of Capitol surveillance footage showing firecracker explosion in the tunnel*

Even among officers who fought in the tunnel for hours, this explosion stands out as particularly memorable. Officers vividly remember being blinded, having their ears ring, and the

intense fear that they were about to experience extreme pain or even death. Two officers experienced tingling in their legs and Officer C.L. experienced second degree burns and a singed uniform.



*Figures 28, 29, & 30 (left to right): Photos taken on January 6, 2021 showing Officer C.L.'s burns and singed clothing*

Although the explosive was small, its impact was significant in the tightly packed tunnel. At least twenty-four officers experienced the blast, and the sight and sound of it was captured on numerous open-source videos and officers' body worn cameras.



*Figure 31: Screenshot from Officer T.C.'s bodyworn camera showing firecracker explosion inside tunnel*



***Figure 32:*** *Screenshot from Detective R.A.'s bodyworn camera*
*showing firecracker explosion inside the tunnel*

Like the later firecracker, which sadly detonated, Judd risked causing the same type of harm when he lit and threw his firecracker into the police line. Judd alleges to have picked up the firecracker on the ground, though he apparently had already possessed a device that allowed him to light the firecracker. After lighting it—an intentional action creating a substantial risk that the firecracker would cause substantial harm to the line of officers—he threw the firecracker directly at the officers.

## III.   THE CHARGES

On December 1, 2021, a federal grand jury returned the fifth superseding indictment, charging nine defendants in fifty-three counts. That indictment charged David Lee Judd in eight of the counts:

- Count 16, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. § 111(a) and 18 U.S.C. § 2;

- Count 22, Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b);

- Count 33, Assaulting, Resisting, or Impeding Certain Officers and Aiding and

17

Abetting, in violation of 18 U.S.C. § 111(a) and 18 U.S.C. § 2;

- Count 34, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2;

- Count 35, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

- Count 38, Disorder and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A);

- Count 52, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) and 18 U.S.C. § 2; and

- Count 53, Act of Physical Violence in the Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F) and 18 U.S.C. § 2.

Following a stipulated trial, the Court found Judd guilty of one count of 18 U.S.C. § 111(a) under Count 22 and one count of 18 U.S.C. § 1512(c)(2) under Count 34.

## IV.   STATUTORY PENALTIES

Judd now faces sentencing for Count 22 and Count 34. Count 22, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Class D Felony), carries a maximum penalty of 8 years of incarceration. Count 34, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2 (Class C Felony), carries a maximum penalty of 20 years of incarceration. Counts 22 and 34 each carry a term of supervised

release of not more than three years, a fine of up to $250,000, and special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The appropriate offense level computations for Count 22 and Count 34, prior to any grouping analysis under Part D of Chapter 3, are as follows:

Count 22: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total for Count 22** | **24** |

Count 34: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Physical Injury/Property Damage | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference | +3 |
| U.S.S.G. § 3A1.2(c) | Official Victim | +6 |
| | **Total for Count 34** | **31** |

The two counts of conviction should be placed into one group under U.S.S.G. § 3D1.2(c). The combined offense level for both counts before acceptance of responsibility is 31.

| | | |
|---|---|---|
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | **Total Adjusted Offense Level** | **28** |

With a criminal history category of I, and an adjusted offense level of 28, the guidelines range is 78-97 months before any departures. U.S.S.G. §1B1.1(a)(4)-(5), (b). As discussed below in Section V (D), the government also seeks a 1-level upward departure, pursuant to U.S.S.G. §3A1.4, n.4, which

would result in total adjusted offense level of 29, and corresponding guidelines range of 87-108 months' imprisonment.

A.      **Application Of Specific Offense Characteristics: U.S.S.G. §§ 2J1.2(b)(1)(B), 2J1.2(b)(2)**

Respectfully, United States Sentencing Guidelines §§ 2J1.2(b)(1)(B) and 2J1.2(b)(2) apply to Count Thirty-Four to account for the severity and complexity of the defendant's behavior. United States Sentencing Guideline § 2J1.2(b)(1)(B) applies to "Obstruction of Justice" offenses and provides for an eight-level increase if the offense involves "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2). Judd has argued that, for the reasons set forth by this Court in connection with the sentencing of *Hunter Seefried*, neither of these specific offense characteristics is applicable to his conduct in this case. *See* ECF No. 518.

The Government acknowledges this Court's rulings in *United States v. Hunter Seefried*, No. 21-cr-287 (TNM), 2022 WL 16528415 (D.D.C. Oct. 29, 2022); *United States v. Rodean*, No. 21-cr-57, Doc. 76 (restricted statement of reasons) (D.D.C. Oct. 26, 2022); *United States v. Secor*, No. 21-cr-157, Doc. 56 at 17-20 (D.D.C. Oct. 24, 2022) (TNM); and *United States v. Hale-Cusanelli*, No. 21-cr-37, Doc. 120 at 50-55 (D.D.C. Sep. 27, 2022) concluding that "administration of justice" in section 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations." For the reasons set forth below, the Government respectfully disagrees with the Court's analysis in those cases.

First, neither dictionary definitions nor usage analysis dictate that the term "administration of justice" be limited to a judicial or quasi-judicial proceeding. The Court was correct to note that the Black's Law Dictionary definitions of "administration of justice" and "due administration of justice" "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried*, 2022 WL 16528415, at *2. However, Black's Law Dictionary also contains broader definitions of "justice" and "obstruction of justice," which relate to the orderly administration of the law more generally. For example, Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see also* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added).

Similarly, while the Court's survey of uses of the term "administration of justice" in legal usage does suggest that the phrase is frequently (and perhaps predominantly) used to refer to "a judicial proceeding deciding legal rights," and to lesser extent, to "law enforcement activities," *Seefried*, 2022 WL 16528415, at *5-8, the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction. Like all words, legal terms often bear multiple meanings. For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense. Which meaning

21

the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and its commentary. *See* U.S.S.G. § 2J1.2 cmt. n.1 (defining "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*") (emphasis added).

Second, section 2J1.2's inclusion of definitions in the commentary that undoubtedly relate to "investigations, verdicts, and judicial determinations" does not support a definition that excludes congressional proceedings. The commentary's use of the word "includes" indicates that the definition is not an exhaustive list. *See* Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Nor does reading the commentary's use of the word "governmental . . . resources"[2] to include congressional resources would not "render[ ] the phrase 'or court' superfluous." *Seefried*, 2022 WL

---

[2] The government's position that the events of January 6, 2021 caused the unnecessary expenditure of substantial governmental or court resources is based not on the number of defendants charged or prosecutions commenced, but on extensive expenditure of government resources in an effort to quell the breach—including the deployment of the USCP, MPD, National Guard, and various other state and federal law enforcement agencies—and to clean up and repair the damage done to the Capitol building and grounds by the rioters. *Compare Seefried*, 2022 WL 16528415, at *8-10, *with Seefried*, Gov't Mem. in Aid of Sentencing, Doc. 115 at 29. The enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources.

22

16528415, at *9. Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is not a superfluity. The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts. And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial). The superfluity canon provides no basis to limit the term to "*prosecutorial* resources." *Id.* Indeed, if the term "administration of justice" in section 2J1.2 refers only to "a judicial or related proceeding," *id.* at *1, then the word "governmental" is itself superfluous.

Third, there is no conflict between the government's interpretation of "administration of justice" in section 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catch-all provision prohibiting obstruction of "the due administration of justice." The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between section 1503 and section 2J1.2 that counsel in favor of reading them differently. First, unlike section 1503, section 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources. Second, section 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice." Third, section 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

Fourth, the application of subsections (b)(1)(B) and (b)(2) only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature itself creates line drawing problems. Those descriptors themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Seefried*, 2022 WL 16528415, at *1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *Seefried*, 2022 WL 16528415, at *1-2, yet it does not involve the "possibility of punishment by the state," *id.* at *2. The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by section 2J1.2. Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Should the Court decline to apply either adjustment, the government will nevertheless seek an upward variance to offense level 28 and ask the Court to impose a sentence of 90 months, as described *infra*. The very conduct that supports the application of these enhancements warrants such a variance. In his quest to disrupt the certification of the electoral college vote count, Judd joined rioters in the tunnel for an hour and a half, battling to gain access to the Capitol building. In doing so, Judd lit and threw a firecracker at a line of officers in the narrow tunnel, certainly constituting a grave threat to at least ten police officers in the vicinity. Judd's actions did not stop there. He immediately walked to the mouth of the tunnel and continued waving rioters inside the tunnel and, eventually, he rejoined

24

the efforts to push through the line of officers. The purpose of Judd's continuous streak of violence was to halt the certification of the Electoral College vote. And it worked. There was no doubt that the interference with the Congressional proceeding that resulted from Judd's continuous breach and assaultive conduct was substantial.

**B.      Application Of Specific Offense Characteristics: U.S.S.G. § 2A2.2(b)(2)(B)**

United States Sentencing Guideline § 2A2.2(b)(2)(B) applies to Count Twenty-Two, because the defendant used a "dangerous weapon." A "dangerous weapon" is one that is capable of inflicting serious bodily injury, closely resembled such an object, or was used in a manner that created the impression the object was such an instrument. *See* U.S.S.G. § 1B1.1 cmt. n.1(E) ("Dangerous Weapon"). When the defendant threw a lit firecracker at a police line composed of at least ten officers, the firecracker was capable of inflicting serious bodily injury.[3]

**C.      Application of Adjustments: U.S.S.G. §§ 3A1.2(a), (b); 3A1.2(c); 3E1.1**

The guidelines calculations identified above also include adjustments found in U.S.S.G. §§ 3A1.2(a), (b); 3A1.2(c); and 3E1.1.

For Count Twenty-Two, U.S.S.G. § 3A1.2(a)(1) and (2) apply because "the victim" of the defendant's assault "was a government officer or employee" and the offense of conviction was

---

[3] In its minute order dated December 17, 2021, this Court denied Judd's motion, ECF 158, to dismiss the section 111 counts on the ground that the firecracker he hurled at the police was not such a weapon. A "dangerous weapon," as used in 18 U.S.C. §§ 111(a) and (b), is an object "that is inherently deadly, like a gun," and also an object that "must be capable of causing serious bodily injury or death to another person and the defendant must use it in that manner." *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002). The Guidelines definition, quoted above, includes that meaning but broadens it to include additional items. It follows that, if the firecracker was a dangerous weapon under § 111, as this Court found, it must have been a dangerous weapon for purposes of U.S.S.G. § 2A2.2(b)(2)(B).

motivated by such status. The victims of the defendant's assault were MPD and USCP officers that were all wearing official law enforcement gear and insignia. Their job was to protect the Capitol and clear the tunnel, and, by virtue of that role, the defendant and other rioters engaged in prolonged assaults against them in attempt to gain access to the Capitol building. Therefore, under U.S.S.G. § 3A1.2(b), a six-level adjustment is appropriate because the applicable Chapter-Two guideline is from Chapter Two, Part A.

Alternatively, this adjustment applies via U.S.S.G. § 3A1.2(c)(1) because, as explained above, the defendant assaulted such officer, knowing or having reasonable cause to believe that a person was a law enforcement officer, during the course of the offense "in a manner creating a substantial risk of serious bodily injury."

For Count Thirty-Four, U.S.S.G. § 3A1.2(c) applies for the same reasons listed in the preceding paragraphs.

Under U.S.S.G. § 3E1.1, the government agrees that Judd has demonstrated an acceptance of responsibility for his offense, and that a three-level reduction is appropriate.

### D.      An Upward Departure Is Warranted Pursuant To U.S.S.G. § 3A1.4, cmt. n.4

Considering the government's calculated guideline range of 78-97 months, the government seeks a 1-level upward departure, pursuant to U.S.S.G. § 3A1.4, n.4, for the reasons discussed below.[4]

An upward departure from the Guidelines range is warranted on the basis of U.S.S.G. § 3A1.4, cmt. n.4 ("Terrorism"), because Judd's convictions under 18 U.S.C. § 1512(c)(2) for

---

[4] The government's request for a 1-level departure pursuant to U.S.S.G. §3A1.4 n.4 is limited to the facts of this case. This request is driven by, among other things, the defendant's degree of conduct, and the degree of his intent.

obstructing Congress's certification of the Electoral College vote and under 18 U.S.C. § 111(a) for assaulting, resisting, or impeding certain officers, were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

Section 3A1.4 allows for an adjustment to the Guidelines range where the defendant's offense of conviction "involved, or was intended to promote, a federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4, cmt. n.1. Where, as here, a defendant's conviction was not for, or was not "intended to promote," an enumerated "federal crime of terrorism," an upward departure is "warranted" under U.S.S.G. § 3A1.4, cmt. n.4(A) ("Note 4(A)") if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."[5]

Here, the PSR, Statement of Offense, and exhibits attached to this sentencing memorandum show that Judd's conduct was calculated for these ends[6] because (1) Judd's statements and travel in

---

[5] The government bears the burden to prove that the U.S.S.G. § 3A1.4 adjustment is applicable with reference to Judd's conviction and "relevant conduct" by a preponderance of the evidence. *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 190 (D.D.C. 2018). Likewise, when seeking an upward departure, "the government has the burden of proof by a preponderance of the evidence." *United States v. Walls*, 80 F.3d 238, 241 (7th Cir. 1996); *accord United States v. Okane*, 52 F.3d 828, 835 (10th Cir. 1995). A defendant's "relevant conduct" is the conduct that "occurred during, in preparation for, or to evade responsibility for" the offense of conviction and includes "all harm that resulted from" or "was the object of" the defendant's "acts and omissions," even if uncharged. *Id*. at 187-88 (citing U.S.S.G. § 1B1.3).

[6] Notably, the upward departure under Note 4(A) may be appropriate even if influencing, affecting, or retaliating against the government was not the defendant's sole purpose or motivation. For example, the D.C. Circuit has held (applying a prior version of section 3A1.4) that a defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was the defendant's "primary purpose." *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014); *see also, e.g.*, *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (holding

advance of the events at the Capitol on January 6, 2021, reflect the requisite intent; (2) Judd was aware of the election certification process set to take place during Congress' Joint Session on January 6, 2021, and he made the Capitol and elected officials inside his targets, so that he could retaliate against them or affect the government conduct in which they were engaged; and (3) Judd physically struggled with police officers, threw a firecracker at their police line, and spent hours exhorting other members of the crowd to attack the police line, further evincing his intent to affect and retaliate against government conduct "by intimidation or coercion," so that he could enter the building and stop the proceeding itself.

First, Judd's statements and travel in advance of the events at the Capitol on January 6, 2021, reflect the requisite intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Prior to January 6, Judd posted an advertisement on social media, asking for a ride to Washington, D.C. to attend the "Stop the Steal" rally.  The advertisement said, "Y'all read to be apart of History??? My name is Judd!!! I worked for the president this year in Maine, I'm a Texas Patriot and American First Supporter. If anyone has an extra spot for the ride there and place to stay, I HAVE MY LICENSE TO CARRY A FIREARM, I am a professional driver and can help with driving and funds too!! It's just me, I'm in north Dallas. Let's fight to Save this Country and Support the greatest President. Text me Judd - ###-###-5770." Exhibit 1. The next day, on January 5, 2021, Judd drove from Texas to the District of Columbia with two

---

an offense may be calculated to influence, affect, or retaliate against government conduct even if a defendant's "particular *motivation* . . . is to impress a more established terrorist with his abilities") (emphasis in original); *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (holding enhancement may apply even if the defendant's conduct "was also calculated to accomplish other goals simultaneously").

people who responded to his post.

Second, Judd was clearly aware of the election certification process set to take place during Congress' Joint Session on January 6, 2021, and he intended to disrupt the activities at the Capitol and the actions of elected officials inside the Capitol, so that he could retaliate against or affect the course of events in the government. Judd admitted as part of his stipulated trial that he made his way to the U.S. Capitol grounds "intend[ing] to stop or prevent Congress from certifying the Electoral College vote results." Judd effectuated that intent by engaging in a prolonged, violent battle against law enforcement in the tunnel. Judd was undoubtedly aware that actions he participated in would put the people inside the Capitol in danger. He also took it upon himself to put the officers in the tunnel in direct danger as an attempt to break through the police line and gain access into the building.

Judd's choice of target—the United States Capitol building in which Congress was undertaking a key function of government—further evidences his intent to intimidate, affect, or retaliate against the government. As Judge Cooper explained in applying the terrorism enhancement in *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 198 (D.D.C. 2018), a defendant's specific intent to influence and retaliate against government conduct can often "be inferred from the defendant's choice of target." Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199. That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing cases); *see also United States v. Hasson*, 26 F.4th 610, 626-27 (4th Cir. 2022) (affirming application of U.S.S.G. § 3A1.4 where the defendant's choice to target politicians indicated that the purpose of his offense was to coerce and

retaliate against the government). So too here. Judd attacked the United States Capitol—the legislative seat of our government—while the entire complement of legislators and the Vice President of the United States were inside performing their constitutional and statutory duties. No one can seriously doubt, with these specific facts, that Judd wanted to influence government by means of force.

Third, Judd physically engaged with law enforcement officers by joining several prolonged and collective efforts to push through the police line and by throwing a lit firecracker at the police line, and encouraged others to push through the police line, further evidencing his intent to influence or affect government conduct and to retaliate against it. Early in the battle, Judd entered the tunnel and assisted in coordinated pushes against police officers. Shortly after, Judd helped coordinate a shield wall to fight against the officers in the tunnel. Then, he upped the ante by lighting and throwing a firecracker at the police line – an act so shocking and dangerous that even nearby rioters were upset by it. The defendant remained in the vicinity for the next hour cheering as the rioters became more brazen as they attacked with weapons like poles and sticks. Just as officers started to gain control of the tunnel, the defendant again joined rioters in using their collective weight to push into police officers.

In summary, the defendant's actions meet the requirements of U.S.S.G. § 3A1.4, Note 4(A), and an upward departure is warranted. The facts that support this departure are also relevant to the Court's assessment of the sentencing factors under 18 U.S.C. § 3553(A), which follow.

Here, Judd helped lead an aggressive charge over the course of a lengthy period, at a critical pinch point, including throwing a lit incendiary – that thankfully did not explode – into a crowded

tunnel occupied with civilians and law enforcement. Judd is all the more culpable for his outrageous conduct because he was deploying this violence "to influence or affect the conduct of government." As such, the conduct falls within the heartland of U.S.S.G. § 3A1.4, Note 4(A).

Given the various facts as described throughout this memorandum, including the defendant's assaultive conduct and his intent to disrupt Congress through intimidation and coercion, the government seeks a sentence on the lower end of the guideline range as calculated by the government.[7] Such a departure epitomizes the crime Judd committed that day.

### E.    Total Adjusted Offense Level[8]

Accordingly, the government's calculation of the defendant's total adjusted offense level, including our request for a 1-level departure, is 29, the defendant's criminal history score is category I (PSR ¶¶ 71-77), and the guidelines range is 87-108 months' imprisonment.

---

[7] U.S. Probation calculated the guidelines like the government but applied the +6 under § 3A1.2(b). The U.S. Probation office noted that it appears the +6 could apply under either § 3A1.2(b) or § 3A1.2(c). The U.S. Probation's calculations provide an end guidelines range of 78-97 months.

[8] If the Court declines to apply the 8-level enhancement under § 2J1.2(b)(1)(B), then § 3D1.2 would not apply. There would be no other basis for grouping since the victims of the section 111(a) offense were the police officers in the tunnel and the victim of the section 1512(c)(2) offense was Congress. In that event, each count would comprise a separate group. Assuming the Court also declined to apply the 3-level enhancement under § 2J1.2(b)(2), the total offense level for Count 34 would be 17, which would be seven levels lower than the offense level of 24 for Count 22. That results in an additional one-half unit, and a corresponding one offense level increase, yielding a combined offense level of 25. U.S.S.G. § 3D1.4. With a criminal history category of I, that produces a guidelines range of 57 to 71 months. U.S.S.G., Chapt. Five, Pt. A.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, the section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature And Circumstances Of The Offense

As shown in Section II (B) of this memorandum, Judd's violent actions and on-the-ground leadership on January 6, 2021, put numerous officers at risk of severe harm and gave momentum to a violent mob seeking to interrupt the certification of the 2020 Electoral College vote. The nature and circumstances of Judd's offenses were of the utmost seriousness and fully support the government's recommended sentence of 90 months.

### B.    The History And Characteristics Of The Defendant

Defendant Judd is a college-educated 36-year-old with a history of working in the hospitality and customer service industries. Judd has led a mostly law-abiding life. He has a single conviction for possession of marijuana from when he was 19 years old. Judd appears to have steady housing and both communal and familial connections.

### C.    The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense And Promote Respect For The Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Judd's criminal conduct in leading, encouraging, and, worst of all, joining rioters for nearly one and a half hours as they engaged in a sustained onslaught against law enforcement was highly dangerous. His actions demonstrate a disregard for the safety of the officers inside the tunnel, as well as a disdain for the legal process inside.

### D.     The Need For The Sentence To Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a lengthy term of incarceration. The United States recognizes that, at the stipulated trial, Judd acknowledged the video evidence that shows him on Capitol grounds and his specific conduct inside and outside of the tunnel, including throwing a lit firecracker at the police line, directing rioters into the tunnel, passing police shields to rioters in the tunnel, and joining rioters in collectively pushing police officers.

Judd submitted a written statement to the Probation Office, whereby he purports to take "full responsibility" for his actions. However, this after-the-fact apology, even if sincere, does not eliminate the need for specific deterrence.

Judd was unphased by the violence that he engaged in and witnessed on January 6. For example, immediately after he threw a lit firecracker at a line of officers, he walked out of the tunnel in a measured manner, turned to rioters, and resumed directing them inside the tunnel. Then, even

---

[9] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

after witnessing sustained violence and battling for nearly one and a half hours, after police officers gained control of the tunnel and pushed rioters out, Judd remained on Capitol grounds until forced out. He was one of the last rioters to be corralled off the grounds by police officers. The government has no confidence that anything short of incarceration will deter the defendant from partaking in such violence in the future.

### E.      The Importance Of The Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Id.* at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s]

the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (Statement of Judge Chutkan).

Moreover, section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at

1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Robertson*, 21-cr-34, Judge Cooper sentenced defendant Thomas Robertson to 87 months of incarceration following his conviction to one count of 18 U.S.C. § 1512(c)(2) and one count of 18 U.S.C. § 231(a)(3). Leading up to January 6, the defendant

---

[10] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (Statement of Judge Pan).

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

advocated on social media for the use of violence to overturn the election results. Robertson traveled to Washington, D.C. prepared; he packed a gas mask, food, and a large wooden stick. While on the West Front of the Capitol, the defendant joined a crowd of rioters blocking MPD's Civil Disturbance Unit that was struggling to move through the crowd on the West Plaza where the unit planned to reinforce the Capitol Police line. The defendant stood temporarily in front of the officers, blocking their path, and raising his wooden stick in "port arms." The officers had to physically move the defendant to make their way through and, when they did, the defendant's stick struck two officers. The defendant then joined the mob of rioters and advanced to the Upper West Terrace and into the Capitol building. The defendant made it into the Crypt but eventually left when ordered to do so by law enforcement. After January 6, the defendant bragged that he was proud of his conduct, and he destroyed his cell phone.

Like defendant Robertson, Judd's actions were exceptionally obstructive to police officers. In Robertson, the defendant temporarily prevented officers from progressing to assist other police officers and secure the building. In Judd's case, the prolonged violence in the tunnel similarly prevented tens of police officers – but for a much longer period, several hours – from assisting other officers and from protecting the Capitol building at the numerous breach points. Although defendant Robertson's pole made contact with two officers attempting to move around him, Judd's intentional act of lighting and throwing a firecracker inside a narrow tunnel tightly packed with police officers (and rioters) was incredibly dangerous and signified an utter disregard for the law and the officers' lives. Thus, when compared, Judd's violent act is more aggravating than Robertson's.

In *United States v. Reffitt*, 21-cr-32, Judge Friedrich sentenced defendant Guy Reffitt, convicted after a jury trial, to 87 months of incarceration following his conviction to one count of each of the following: 18 U.S.C. § 1512(a)(2), 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 231(a)(2), 18 U.S.C. § 231(a)(3), and 18 U.S.C. § 1752(a)(1). In *Reffitt*, the defendant traveled from Texas to Washington, D.C., with an AR-15-style semi-automatic rifle and a Smith & Wesson .40 caliber handgun. On January 6, 2021, Reffitt went to the Capitol to participate in the riot and to obstruct Congress from meeting to certify the vote. While at the Capitol, Reffitt, armed with his handgun in a holster on his waist, wearing a tactical helmet and bulletproof armor, and carrying police-style flexicuffs, confronted three U.S. Capitol Police officers on the West side stairs, just North of the temporary scaffolding, outside of the Senate Wing. Reffitt rushed at officers, who unsuccessfully tried to repel him with two different types of less-than-lethal projectiles before successfully halting his advances with pepper spray. Before being hit with pepper spray, Reffitt encouraged other rioters to charge forward at the officers, which they did by moving up the stairs and by climbing up through the scaffolding, overwhelming the police officers trying to defend their position on a landing at the top.

Like defendant Reffitt, who assumed a leadership role when he charged at officers forging the way for other rioters, Judd assumed a leadership role in and around the LWT tunnel on January 6. Judd coached and encouraged rioters into the tunnel and assisted them as needed outside the tunnel. He cheered on violence, encouraged rioters to engage in the attack against police officers in an effort to gain access to the Capitol building, passed shields into the tunnel that were used by rioters as weapons, and joined the masses in collectively pushing against the line of officers. Although Judd's

and Reffitt's leadership roles were similar, unlike Reffitt, Judd resorted to physical violence by actually *using* a dangerous weapon to achieve his goals. When Judd lit and threw a firecracker directly at police officers packed in a narrow tunnel that was crowded with police officers, he endangered the lives of every person in that tunnel. As such, a greater sentence is warranted here.

Finally, in *United States v. Thomas Webster*, 21-cr-208, Judge Mehta sentenced the defendant Thomas Webster, convicted after a jury trial, to 120 months of incarceration. That case involved a protected physical assault against a single officer who the defendant had picked out from the police line. But the defendant in *Webster* went to trial, was convicted of 18 U.S.C. § 111(b), and obtained multiple enhancements for destroying evidence and using body armor. He also did not receive acceptance for responsibility and lied under oath during trial. Saliently, the guidelines in *Webster* were significantly higher (210-262 months).

While there are no identical factual scenarios, these cases provide guidance as to the appropriate range for convictions under this statute in the context of the violence on January 6, 2021. It further helps to show that the government's recommendation, at the end of the day, is reasonable.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663),

"provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[12] Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[13] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that . . . Congress somehow meant

___

[12] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement. *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice*, Case No. 13-cr-0495-01 (ES), 2020 WL 220089, at *5 (D.N.J. Jan. 15, 2020). The defendant in this case did not enter into a plea agreement.

[13] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

to exclude the Government as a potential victim under the MVRA when it adopted the definition of "victim" contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[14]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (holding that restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259

---

[14] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  *Fair*, 699 F.3d at 513.  Here, the Court should find that Judd's actions, including throwing a lit firecracker inside the U.S. Capitol tunnel at police officers, as well forcibly attempting to breach the police line and to enter the Capitol building, caused damage to that building.

that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[15]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see*

---

[15] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Judd to pay $2,000 in restitution for his convictions on Counts Twenty-Two and Thirty-Four. The breach of the Capitol ultimately resulted in more than 2.8 million dollars in losses,[16] and a $2,000 fine fairly reflects Judd's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 90 months of incarceration, three years of supervised release, restitution in the amount of $2,000, and a special assessment of $200. This sentence falls at the low end of the defendant's Sentencing

---

[16] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Guidelines range of 87-108 months and appropriately balances the factors articulated in 18 U.S.C.

§ 3553.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      */s/ Ashley Akers*
ASHLEY AKERS
Trial Attorney
MO Bar No. 69601
U.S. Attorney's Office (Detailee)
601 D Street, N.W.
Washington, D.C.
202-353-0521
Ashley.Akers@usdoj.gov