**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID JUDD,<br><br>           Defendant. | Crim. Action No. 1:21CR40 (TNM) |

## <u>MEMORANDUM IN AID OF SENTENCING</u>

David Judd traveled to the "Stop the Steal" rally from his home in Texas because he wanted to support the President that he then admired and hear his final speech as president. He hitched a ride with two women who happened to be driving to the rally from Dallas. He did not plan to meet anyone at the rally, let alone anyone planning acts of violence. Mr. Judd has never been affiliated with any extremist group—in fact, he had never even heard of some of the fringe groups who gathered on January 6. Mr. Judd did not bring any weapons of any kind with him to Washington, D.C. He did not bring a flag or a sign; he dressed in street clothes. He did not bring any protective gear such as goggles or a helmet—why would he? His only intent in coming was to celebrate the President and hear the speeches. Once he arrived in Washington, D.C. on January 5, Mr. Judd walked around, snapped pictures, and visited the Trump hotel. He arrived at the Ellipse very early in the morning on January 6 so he could be in a good position to hear the speeches. He was in a celebratory, happy mood.

While listening to the speeches and talking to other rally-goers, Mr. Judd learned of a plan making its way through the crowd. The idea was to protest at the Capitol so that the vote certification would be delayed during which time Vice President Pence would send the votes in "disputed" states back for a recount. President Trump alluded to this plan in his speech, inviting everyone to join him at the Capitol "to make their voices heard so that Mr. Pence 'would do the right thing.'"[1] Mr. Judd is not an expert in election law. The plan to encourage a recount seemed sensible to him. After all, President Trump and other prominent elected officials had been pressing the idea that there had been rampant election fraud for months. If there was all of this fraud, Mr. Judd thought, they should get a recount. As a result, he moved with thousands of others towards the Capitol, just as the President had told them to do.

Once Mr. Judd arrived, he joined the crowds swelling towards the building and found himself by the area now infamously known as the "tunnel," where protestors were trying to gain entry into the building. Again, in his mind, they just needed to delay the vote so that the election fraud that president had talked about could be remedied through a legal recount. He joined the crowd, both physically and emotionally, waving others to come forward and joining-in to the crowd's activities. As the crowd and the chaos in the tunnel intensified, in a moment that will haunt Mr. Judd for the rest of his life, he tossed what appeared to be and—according to an expert in pyrotechnic devices—*was*, a small sparkler into the "tunnel." Now two years

---

[1] *See* Exhibit 6 compilation of portions of Mr. Trump's speech, submitted to chambers.

away from the chaos of that day, he still struggles to understand how he could have done such a stupid, reckless, scary thing. His impetuous tossing of the sparkler was an uncharacteristic lapse of judgment for a man who had lived a life defined by hard work, devotion to family and God, and service to his church and community.

Mr. Judd has expressed his sincere remorse in his letter to the Court and in the video submitted to chambers, which includes statements from Mr. Judd, members of his family, neighbors, and former co-workers.[2] As the Court can see for itself in Exhibit 7, Mr. Judd is genuinely contrite about his conduct and apologetic to the officers and others in the tunnel who saw the thrown sparkler and worried about its potential danger.

Mr. Judd has experienced severe consequences for his impetuous, reckless act. He became a prisoner for the first time in his life. He spent over one month in jail in transit from Texas to Washington, D.C., where he was ultimately released with stringent conditions with which he has consistently complied. Since his conviction by way of a stipulated trial agreement, he has been fired from three jobs—not because of any issues with the quality of his work (testaments from his co-workers show that he was model employee)[3]—but solely as a result of his publicized felony convictions at the conclusion of the stipulated trial in August 2022.

Moving forward, for the rest of Mr. Judd's life, his felony convictions will continue to disrupt his ability to obtain employment and to advance in the hospitality

---

[2] *See* Sentencing Video, Exhibit 7, submitted to chambers.
[3] *See* Sentencing Video, Exhibit 7, submitted to chambers.

and management industry, notwithstanding his college degree and considerable experience in the field. And Mr. Judd's actions resulting in felony convictions have caused him to lose other privileges and liberties afforded to all citizens. Indeed, no matter what sentence this Court imposes, Mr. Judd will continue to experience the ripple effects of his destructive lack of judgment for the rest of his life.

Mr. Judd has unequivocally accepted responsibility for his conduct. From the outset, through counsel, he has communicated his desire to resolve the case and spare the government the resources of a trial. He knows that he must be punished for what he did. That said, Mr. Judd's conduct is nowhere near deserving of the sentence recommended in the pre-sentence report ("PSR") and the 90 months recommended by the government.

Mr. Judd has reviewed the PSR and offers the following objections:

First, for the reasons this Court articulated in *United v. Hunter Seefried*, No. 21-cr-287 (TNM), 2022 WL 16528415 (D.D.C. Oct. 29, 2022), which reasoning Mr. Judd adopts and incorporates here for his sentencing, the PSR wrongly assesses a total 11-level increase under § 2J1.2 because Mr. Judd's conduct did not involve the substantial interference with the "administration of justice."

Additionally, Mr. Judd submits that the official-victim enhancement does not apply because Mr. Judd was not motivated by any officer's status nor did he act in a manner creating a substantial risk of serious bodily injury. Indeed, according to a career federal law enforcement officer who retired from the ATF as an Explosives Enforcement agent, the object Mr. Judd tossed was incapable of causing serious

bodily injury.[4] USSG § 3A1.2(a) & (c)(requiring that the defendant be motivated by the victim's status or that the defendant acted in a manner creating a substantial risk or serious bodily injury.). Therefore, Mr. Judd respectfully submits that the correctly-calculated offense level is 12, resulting in a guideline range of 10 to 16 months.[5]

Regardless of the guideline range this Court calculates, Mr. Judd, through counsel, respectfully submits that, consistent with the principle articulated by the Supreme Court that "the punishment should fit the offender and not merely the crime," *Pepper v. United States*, 562 U.S. 476, 477 (2011), this Court should impose a sentence of time-served, followed by a period of supervised release with those conditions the Court sees fit to impose.[6]

## I.   Objections to PSR

### A. The PSR incorrectly applied the U.S.S.G. § 2J1.2 specific offense characteristics.

The PSR added eleven levels to Mr. Judd's total offense level for two instances of interference with the "administration of justice" under U.S.S.G. § 2J1.2(b). In another January 6 case, this Court has already held that these specific offense characteristics do not apply because the certification of the vote does not involve the "administration of justice." Mr. Judd respectfully adopts and incorporates the

---

[4] Affidavit of Jerry Taylor, attached as Exhibit 2.

[5] Under § 3D1.1(b), Counts 22 and 34 group for guidelines calculation purposes and USSG § 2J1.2 determines the offense level. PSR ¶ 60.

[6] Mr. Judd was detained between his arrest on March 26, 2021, until he was ordered released by the Honorable Robin M. Meriweather on May 12, 2021. Therefore, time-served would constitute a sentence of approximately 45 days in custody.

reasoning in that decision here. The Court's ruling applies with equal force to Mr. Judd's case. Therefore, for the reasons set forth in this Court's opinion in *United States v. Hunter Seefried* No. 21-cr-287 (TNM), 2022 WL 16528415 (D.D.C. Oct. 29, 2022), application of these enhancements would be a legal error and should not be applied in this case.

## B. The official-victim enhancement does not apply.

The PSR incorrectly applies a 6-level enhancement for official victim. The applicable guideline provides in full: (Apply the greatest):

> (a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was *motivated by such status*, increase by **3** levels;

> (b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by **6** levels.

> (c) *If, in a manner creating a substantial risk of serious bodily injury*, the defendant or a person for whose conduct the defendant is otherwise accountable –

> (1) knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom; or

> (2) knowing or having reasonable cause to believe that a person was a prison official, assaulted such official while the defendant (or a person for whose conduct the defendant is otherwise accountable) was in the custody or control of a prison or other correctional facility, increase by **6** levels.

USSG § 3A1.2 (italics added; bolded in original).

6

In the commentary, the Commission explains in pertinent part that "motivated by such status," means that the offense of conviction was motivated by the fact that the victim was a government officer or employee. *Id*. cmt. n.3. The Commission goes on to provide an example "where both the defendant and the victim were employed by the same government agency and the offense was motivated by a personal dispute." *Id*.

Thus, for the enhancement to apply under § 3A1.2(b), the defendant must have been motivated to act by the victim's status and not for some other reason. Mr. Judd acted impetuously and without thinking. If anything, Mr. Judd was motivated to act to clear the crowd to help people get into the Capitol. That the police officers were police officers was incidental. This is evidenced by the fact that he tossed the sparkler in an area where both protestors and police officers alike were standing. While reckless, Mr. Judd's act was not motivated by either group's status. Therefore, subsections (a) and (b) do not apply.

Nor does subsection (c) of the guideline apply. As explosives expert Mr. Taylor explains in detail in his Affidavit, the sparkler Mr. Judd threw could not have caused serious bodily injury in any context. Therefore, he did not act "in a manner creating a substantial risk of serious bodily injury."

Finally, Mr. Judd disagrees with the government that the aggravated assault guideline, USSG § 2A2.2, applies to Count 22. A plain reading of the Guidelines shows

that USSG § 2A2.4 applies (Obstructing or Impeding Officers) applies.[7] Under that Guideline, the official victim enhancement does not apply because it is incorporated into the base offense level of 10. Cmt. 2. Therefore, if the Court applies 2A2.4, the base offense level is 10.

## II. Application of the Sentencing Factors

### A. Mr. Judd's history and characteristics demonstrate that a time-served sentence is appropriate.

#### i. Mr. Judd's upbringing centered around family, faith, and hard work.

David Lee Judd was born and raised in Dallas, Texas. He and his two siblings were raised by their mother Cheryl and father DeForrest Judd. David enjoyed a relatively stable middle-class upbringing, though unbeknownst to David, his father was a functioning alcoholic. His parents divorced when he was 29 years old. One year later, Mr. Judd's father died from complications due to his years of alcohol abuse. David's mother married her high school sweetheart Jay Conley in 2021.

Growing up and to this day, David's daily life centered around family, work, and faith. His sister writes, "David and I share a love for family game nights, and love to laugh together with our family."[8] David's mother Cheryl speaks of David's devotion to his family in her letter to the Court, describing how when the pandemic

---

[7] Application Note 1 to 2A2.2 relevantly defines "aggravated assault" as "a felonious assault that involved a dangerous weapon with intent to cause bodily injury (i.e. not merely to frighten) with that weapon or an intent to commit another felony. Neither of these prongs apply. As established in the statement of offense, Mr. Judd was not convicted of using a dangerous weapon with an intent to cause bodily injury or intent to commit another felony. Therefore, the aggravated assault guideline does not apply.

[8] Letter of Jessica Judd, attached as part of Exhibit 1.

shuttered her travel business, David came home to support the family and took over managing full-time care of Cheryl's mother.[9] Now managing her own health issues, Cheryl writes, "I myself, have been diagnosed with health issues these past few years and depend on David for daily care."[10]

Growing up, Cheryl and DeForrest took the kids to church every Sunday. For David, the church was not just something he visited on Sundays; the church became his community, a place where he met his closest friends and mentors. For the past twelve years, David has been member of the Grapevine Church of Christ. Prior to his arrest in this case, he taught Bible studies to adults every week and played in the congregation's rock band, but he was removed from those activities due to his arrest in this case.

Though he was devastated when he was told he could no longer teach or play in the band due to his arrest, Mr. Judd continues to attend church on a weekly basis and has leaned heavily on the community as he navigates his "new normal" of being someone publicly known for January 6 and the harsh attendant consequences. Of David's involvement in the church, David's stepfather writes, "aside from past events by the church, those that have included the presentations and community involvement, David currently attends church twice a week. His leadership in the singles groups has enlightened and comforted others with their own daily life."[11]

---

[9] Letter of Cheryl Judd, attached as part of Exhibit 1 ("he took over helping [his grandmother] with physical therapy, oxygen machines, medicines, meals, daily hygiene, and did this on his own without me asking for help.").
[10] *Id.*
[11] Letter of Jay Conley, attached as part of Exhibit 1.

Several of David's friends from church echoed David's important role as a leader and mentor at the church. These testimonials, included in Exhibit 7, from people who know David in an entirely different context than the unique and limited events of January 6 show that his acts that day were an aberration for someone widely known to be thoughtful and empathic towards others.

### ii.  *Mr. Judd persevered in establishing a career and graduated college with a degree in hospitality management.*

David graduated high school from Creekview Public High School in 2004. Always a sociable and outgoing person, David was drawn to the hospitality and service industry at an early age. He enjoyed the busy cheer of a retail store or restaurant, and he excelled at interacting with customers. As documented in the PSR, after high school he worked in the service industry in various capacities for over a decade. David foresaw the potential of a lifelong career in the hospitality industry, and to develop the education and experience to excel and advance, he pushed himself to obtain a college education. In 2015, he graduated from the University of North Texas with a degree in hospitality management. His parents were as pleased and proud of David as he himself was.

In 2019, David landed his first management job as assistant general manager at Chik-fil-A in the Dallas airport. He worked as the assistant manager until the COVID-19 pandemic hit and he, like many in the service industry, lost his job. David was unemployed, looking for full-time work at the time of this offense.

In July 2021 while this case was pending, he was hired at Total Wine, where he worked as a team store member until he was convicted of the instant offenses

before this Court on August 23, 2022. The conviction was publicized in the local media.[12] Immediately after the stipulated trial, he was notified that he could no longer serve as game day manager for the Dallas Cowboys, a position he had enjoyed doing part-time. Total Wine also let David go in consequence. One of undersigned counsel spoke with several of the Total Wine staff and several of them agreed to add video testimonials, which are included in Exhibit 7. Each said that they enjoyed working with David and that he was a valued employee. As one former co-worker wrote in a letter to the Court,

> David is always concerned about people's feelings and affairs and he is more than willing to bring creative ideas and insight to any situation being addressed. He is very insightful, collaborative, hardworking and generous and is keen to offer suggestions and ways to improve any project in which he is involve.[13]

David was discouraged to be let go from jobs he enjoyed, but he persevered, soon rehired by Southern Glazer's Wine and Spirits. After he working there for a spell, the management there learned of David's convictions when he filled out additional employee paperwork. The nature and context of the convictions were more than that business wished to be associated with, and consequently, David was let go from that job as well. Yet again, David persevered. While he was forced to temporarily leave the hospitality industry, he is currently employed.

---

[12] *See e.g.*, Marfin, Catherine, *Carrollton man found guilty of federal charges for role in U.S. Capitol Riot*, THE DALLAS MORNING NEWS, August 23, 2022; https://www.dallasnews.com/news/courts/2022/08/23/carrollton-man-found-guilty-of-federal-charges-for-role-in-us-capitol-riot/#.
[13] Letter of A.M. Rubi Desloriuex, attached as part of Exhibit 1.

### iii.    Mr. Judd has no prior convictions

At 36 years old, David has no prior criminal convictions, whether as an adult or as a juvenile. David was arrested once before when he was nineteen years old for possession of marijuana. The charge was dismissed pursuant to a deferred prosecution agreement. He has no other arrests or convictions.

### iv.    Mr. Judd's interest in politics blossomed when Donald Trump campaigned to become President of the United States.

Cheryl and Deforrest raised David to be a traditional, moderate conservative. Though he had conservative values, David was never involved in politics or political campaigns until Donald Trump exploded onto the electoral scene in 2015. Prior to Donald Trump, David had been drawn to other charismatic political leaders, such as Barack Obama and Hillary Clinton. David and his family fondly recall meeting Secretary Clinton on a trip to Washington was she was a Senator. Indeed, while he favored Republican candidates who shared his values, David has admired a number of politicians, no matter their political party.

In 2015, David heard Donald Trump speak for the first time when David was working concessions at the American Airlines stadium during one of then-candidate Trump's rallies. Mr. Trump struck David as provocative and funny, and he noticed how the candidate energized the large crowd. The Trump rally felt like being at a fun party or concert full of like-minded Texans. David walked away with the impression that Mr. Trump cared about regular, hard-working Americans like him and his family. In Mr. Trump, David found someone who had a celebrity's charisma like Barack Obama but who appeared to share David's conservative values. After that

first rally that he happened to catch because he was working, David began to follow Mr. Trump, sharing Mr. Trump's tweets and messages on his Facebook. It seemed like his entire family and community were also avid supporters of candidate Trump. In October 2020, David traveled to Maine as part of Stampede America, a national political consulting company that provides grass roots canvassing for conservative candidates and causes to campaign for President Trump.[14] Leading up to the 2020 election, he attended several Trump rallies, alongside thousands of fellow law-abiding citizens who supported the candidate. Throughout it all, Mr. Judd was an engaged, lawful, peaceful participant in our democratic process; he *never* affiliated with any radical groups and he *never* espoused or engaged in violence in expressing his political views on social media or otherwise. Indeed, the government mined Mr. Judd's social media. Even during the heated lead-up to the 2020 election and afterwards, when people on both sides of the aisle were expressing themselves in extreme and often crude manners on social media, Mr. Judd's social media activity was limited to sharing Mr. Trump's tweets claiming voter fraud and widely-shared, innocuous (if not a little silly) memes questioning the legitimacy of Mr. Biden's election.[15] He *never* espoused—and it would never occur to him to espouse—violence or any other illegal means to achieve a desired political result. To the contrary, David upheld the values

---

[14] According to its website, Stampede America is an "[a]ward-winning canvassing program run by America's veterans." https://www.stampedeamerica.com/.

[15] Of course, Mr. Judd was not the only person questioning the election results. Millions of Americans believed Mr. Trump's claims of voter fraud, including prominent elected officials. To this day, there are sitting members of Congress who continue to dispute the election results. *See e.g.*,James Bickerton, *Full list of election deniers who won their races*, NEWSWEEK, February 5, 2023.

of our democracy by registering people to vote and by going door-to-door to try to persuade people to vote for the Republican nominee for the U.S. Presidency, Donald Trump.

### B. The nature and circumstances of Mr. Judd's first and only offense do not warrant a prison sentence.

After the presidential election, former President Trump, members of his inner circle, and some members of the media began circulating the word that the election was "stolen." The now known to be false claims spread on media—from local Texas news outlets, to Facebook, to some national broadcasts—that the election had been corrupted.[16] Hearing these reports, David and his family became concerned. They

---

[16] For example, one news source stated that Texans should be wary of voting by mail in the 2020 election because mail-in ballots are "ripe for fraud and abuse." Robert Montoya, *Are Texas Elections Secure?*, TEXAS SCORECARD (Nov. 6, 2020), https://texasscorecard.com/state/are-texas-elections-secure/. *See, e.g.,* Tucker Higgins & Kevin Breuninger, *Texas sues for battleground states in Supreme Court over 'unlawful election results' in 2020 presidential race*, CNBC (Dec. 9, 2020), https://www.cnbc.com/texas-sues-four-battleground-states-in-supreme-court-over-unlawful-election-results.html (reporting on Texas lawsuit filed after 2020 election which argued that election results in Pennsylvania, Georgia, Wisconsin, and Michigan . . . should be declared unconstitutional based on the states' use of COVID pandemic to change their election outcomes); Donald Trump (@realDonaldTrump), TWITTER, (Dec. 9, 2020, 8:39 AM), https://twitter.com/realDonaldTrump/status/trump-tweets-his-campaign-will-join-paxsons-election-suit (Mr. Trump tweeted in support of the above Texas lawsuit contesting the election results in battleground states, stating that the lawsuit was "very strong, [with] ALL CRITERIA MET. How can you have a presidency when a vast majority think the election was RIGGED?"); Kate McGee, *Texas Republicans decline to condemn President Trump's premature declaration of victory while votes are still being counted*, THE TEXAS TRIBUNE (Nov. 4, 2020), https://www.texastribune.org/texas-republicans-trump/ (reporting how many Texas republicans, including Senator Ted Cruz, Senator John Cornyn, and Governor Greg Abbott, were silent on the matter of "Donald Trump prematurely and falsely [declaring victory]" in the 2020 election and U.S. Rep. Jodey Arrington stating that

believed—because of what the President and other prominent politicians and media figures were saying—that the democratic process had been undermined by fraud. When President Trump started advertising the "Stop the Steal" rally, the family, including David, his mother, an aunt and an uncle, started a text chain to plan travel to Washington, D.C., to support the President and to protest against election irregularities. That was it. There was *never* any discussion within the family about a plan to do anything more than hear the President speak for the last time as President and to protest against election fraud. As David's Aunt Sharon explains, "there was never any mention of civil disobedience."[17] While the events that unfolded on January 6 have been labeled "an insurrection," overturning the government was the last thing from *David's* mind as he discussed plans with his family to see the President speak. To the contrary, he felt it was his patriotic duty as an American to support the President and to advocate—in the form of his physical presence at a peaceful protest—against election fraud.

In the end, members of David's family could not attend the Stop the Steal Rally with him. David's mother Cheryl wanted to go but felt she should stay home with her mother, who was unwell.[18] Because his family could not travel with him, David posted

---

"there are legitimate concerns regarding the potential for fraud [in the election] that must be addressed in order for the country to move forward").

[17] Letter of Sharon Woodson, attached as part of Exhibit 1.

[18] Cheryl's mother, David's grandmother, passed away in February 2021.This Court has twice granted Mr. Judd's request to attend family memorial events. *See* Minute Orders, Nov. 18, 2021, Jan. 17, 2023. The Court has also permitted Mr. Judd to travel to attend a church retreat. *See* Minute Order September 8, 2022. Mr. Judd attended and returned from these trips without incident.

a message on social media looking for a ride. In the message, he advertised that he was a lawful firearms owner. He did not advertise that because he planned to bring a firearm. He did not plan to bring one. And he did not bring one. David included in his biography that he was then a licensed firearms owner because where he comes from, that designation is a signal that one has been checked out and does not have a criminal record. Two women from his area responded to the message and gave him a ride down to Washington for the rally. They arrived a day before the rally.

David arrived in Washington on January 5 in a celebratory mood. He anticipated hearing President Trump the next day and celebrating his historic presidency. David was in Washington, D.C. as a tourist, not an insurrectionist. That night, David visited the Trump hotel, where the mood was particularly festive. He took the picture below of the hotel on his phone:



After spending some time at the Trump hotel, David went back to the hotel he had booked and slept for a few hours. He arose very early to get a good place at the Ellipse to hear the speeches. That day, he traveled alone donning only his ordinary street clothes and the ubiquitous red Make American Great Again hat. While waiting at the Ellipse before dawn, he snapped photos and videos, including this one below of the stage as the organizers were setting up in the dark.



Because he arrived so early, David was in a good spot to hear all of the speeches, including the President's. He was energized by the speeches and the crowd around him. He heard Mr. Trump's call to meet him at the Capitol to have their voices heard in order to "save our democracy." [19] Mr. Trump also told his followers that "they wanted to re-certify the votes," and the only way to do that would be to have "Mike

_____

[19] During his speech, Mr. Trump urged his followers to "walk down to the Capitol" to "demand that Congress do the right thing and only count electors who have been lawfully slated."[19]

Pence send it back."[20] He also warned that if Mike Pence did not send it back, America would have an "illegitimate president."[21]

While listening to the speeches, David overheard in the crowd that other rally goers were planning to protest at the Capitol with the aim of delaying the certification of the vote so that the Vice President could "send it back" for a recount, just as the President had suggested. This support of the President's call made sense to David— if there had been election fraud as rampant as the President had described, a recount should occur. Prior to that morning at the Ellipse, David had not been aware that the certification of the vote was taking place that same day, nor did he understand the significance of the certification of the vote. After the speeches, David followed and joined the large crowd as they walked to the Capitol.

At the Capitol, David followed the swell of the crowd to the lower west terrace and stood at the mouth of the now infamous "tunnel." While he wanted to protest and hoped that the certification would not occur, he never intended, and he never tried, to enter the building. The crowd by the tunnel was overwhelming and at times, frightening. David witnessed police officers pepper spraying protestors. Protestors and officers alike were yelling and pushing. At several points, David helped people wipe tear gas from their eyes. Ignoring the voice in his head telling him to get out of there, he succumbed to competing impulses to stay and help the protestors and to make his voice his heard. Mr. Judd has turned those moments over and over again in

---

[20] Portions of Mr. Trump's speech, submitted to chambers as Exhibit 6.
[21] *Id.*

his mind since January 6. He is painfully aware that when things started to get out of control, he should have listened to the voice in his head telling him to leave. To his shame and deep regret, he did not leave but instead stayed and participated in some of the crowd's actions contrary to the requirements and directions of the officers. Indeed, in a moment of astonishingly bad judgment David tossed what he knew to be a sparkler into the tunnel. As he stated in the PSR, "I know there is no good explanation for what I did." The sparkler emitted a brief light and then extinguished immediately. No one was injured.

David has acknowledged that his tossing the sparkler was reckless, dangerous, and downright stupid. He has acknowledged that "as I look back on it, I see how stupid and dangerous it was."[22] He has admitted guilt to two felonies, and he has already experienced some consequences for his foolish, illegal choices. That said, it is important for counsel to underscore that **the object that David tossed was not a dangerous weapon[23] in that it was incapable of causing serious bodily injury in any context**. Indeed, according to Jerry Taylor, a career federal law

---

[22] PSR ¶ 55.

[23] In the District of Columbia, a dangerous weapon is anything that is *likely* to produce death or great bodily injury by the use made of it. An object is likely to produce great bodily injury if: (1) the design of the object is such that in its ordinary use it is likely to cause great bodily injury; or (2) the surrounding circumstances indicate that an object capable of causing great bodily injury is likely in fact so to be used. *United States v. Broadie*, 452 F.3d 875, 881-82 (D.C. Cir. 2006) (citing *Strong v. United States*, 581 A.2d 383, 386 (D.C.1990)) (internal quotations omitted). Serious bodily injury is defined as bodily injury "which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365.

enforcement officer who retired from the ATF as an Explosives Enforcement agent, the object that David tossed was not a firecracker. Instead, the video (including enhanced video, which the defense provides to the Court as Exhibit 2a) shows that it had the properties of a "small sparkler/fountain, which is a pyrotechnic device that produces a brief and brilliant light and then is immediately consumed." Taylor Aff. ¶ 6.

Mr. Taylor's expert opinion is supported by the fact that when the item was in the air, it emitted a bright light that immediately extinguished and emitted smoke once it fell to the ground, as captured by the still frames from an officer's body worn camera.[24]



---

[24]BWC of MPD Officer Jesse Leasure, "20210106-FELONY_RIOT-US_CAPITOL_BUILDING"







**Smoke emitting from sparkler on the ground.**

After reviewing all the available video that captured the toss as well as enhanced video, Mr. Taylor concluded that it would be "near impossible" for the sparkler to produce serious bodily injury, even in the context of a crowded tunnel. This is because the device's "sparkle" effect is immediately consumed and not intended to explode. Taylor Aff. ¶ 9.

21

After tossing the sparkler, David remained outside the tunnel. He never went inside the building and he never had direct, physical contact with any officer. He never shouted any threats towards officers and never injured anyone. He left the Capitol altogether after 4 p.m. He returned to his hotel that evening and drove back to Texas the next day with the women with whom he had driven to Washington, D.C.

### i. Mr. Judd's genuine remorse and complete acceptance of responsibility.

Mr. Judd has spent countless nights reviewing what happened on January 6 in his head. He has reckoned with the impetuous part of him that caused him to do something so out of character. He has expressed his regret to his loved ones and church community. Consistent with his early and unequivocal desire to accept responsibility, since early on, he maintained a desire to resolve this case short of a trial. Indeed, the Court may recall that as early as March 2022 and shortly after substantial discovery had been disclosed, undersigned counsel represented that counsel had been engaging in plea negotiations with the government. Counsel's persistent (and rebuffed) efforts to negotiate a more favorable plea agreement for Mr. Judd should not be taken as any reluctance on Mr. Judd's part to resolve the case expeditiously. Ultimately, the government offered a stipulated trial agreement, which Mr. Judd entered into on August 23, 2022, whereby he admitted conduct that resulted in the Court convicting him of two felony offenses and retained his ability to perfect an appeal as to the obstruction count like other defendants in the Court.

**C.  A sentence of time-served followed by supervision will achieve the goals of sentencing.**

i.  *45 days in custody, followed by 18 months of strict pre-trial supervision, followed by supervised release with continuing conditions is a just punishment for David's offense in which no one was injured.*

The circumstances of David's arrest and transport to this district in government custody were punishing in and of themselves. The morning of his arrest, multiple armed marshals knocked on his door at 6 a.m. David, Jay, and Cheryl were home but fast asleep and thus did not answer the door right away. The marshals opened the door with a battering ram. Cheryl Judd was terrified and continues to have nightmares about that morning to this day. The agents pulled David out on to the front lawn wearing only his boxer briefs and a t-shirt as the searched the home. He was taken into custody that day and taken on the circuitous route to this district in Marshal's custody, all with facilities imposing stringent conditions to minimize the infection of COVID-19, stopping at the notorious "Supermax" Oklahoma prison where federal detainees are strip-searched and processed. During this trip, David had no idea what was going to happen when he arrived in D.C.; he did not have a lawyer to call; and he was permitted limited phone calls to his family. When he finally talked to one of undersigned counsel at his initial appearance, David wept with relief. Following his detention hearing, Judge Meriweather placed him on home incarceration, which as this Court is aware, is the strictest level of supervision. David served approximately forty-days in custody prior to his release. After several months of perfect compliance, this Court loosened his restrictions, though he still wears a

GPS monitor. Following his sentence, David will continue to be monitored on supervised release with restitution obligations, which, to be clear, are in and of themselves forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve a day of supervised release."); *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"); *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is […] part of the criminal defendant's sentence.").

David's time in custody, with an extended period of supervision, in addition to the collateral consequences he has and will continue to experience, together constitute a sentence that meets the goals of 3553(a).

> ### ii. *The Court should consider the severe collateral consequences that attach to Mr. Judd's convictions in assessing whether the sentence meets the directives of 3553(a) to impose a sentence that constitutes a just punishment and constitutes adequate deterrence.*

Mr. Judd's stipulated trial agreement was widely publicized in the local Dallas news. As soon as management at Total Wine learned that he was convicted of felonies, he was let go, per company policy. He was also let go from his job managing concessions sales when the Dallas Cowboys played, something he had been doing off and on for years. Though he was devastated to lose jobs that he loved and at which he had excelled, David was determined to continue working. He quickly landed

another job at another wine and beverage company; however, when his paperwork was processed and management learned of his offenses, he was let go from that job as well. He was also told that he was no longer permitted to teach bible studies or play in the Grapevine church band, two activities which he had enjoyed. Determined not to be defeated by these swift and severe consequences, David persevered. Recently, a salesman from Apex Home Solutions, David Pelissie, came to Mr. Judd's house to see if the family needed new windows. Mr. Pelissie noticed David's ankle monitor and inquired. After meeting David, Mr. Pelissie was struck by David's gentle demeanor and apparent work ethic. In his letter to the Court, Mr. Pelissie writes, "I spent several hours with [David] and his family, a very clear picture began to take shape of a very kind, gentle, and genuine individual."[25] Following this happenstance meeting, Mr. Pelissie offered David an interview after which he offered David a position as a junior representative in sales. David works five days a week, approximately 40 hours a week. As he describes in his letter, David's supervisor Mark Pelissie has been impressed with David's work and writes, "he is finding passion for what we do to improve the lives of our customers."[26]

Though David is grateful to be employed in any job, he misses working in the hospitality industry and he knows that he will be blocked from many advanced positions due to his felony convictions.

---

[25] Letter of Marc Pelissie, Exhibit 1.
[26] *Id.*

The collateral consequences that attend to Mr. Judd's felony conviction cannot be overstated. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, in another January 6 case, the Honorable Amit P. Mehta observed

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[27]

Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 (*internal quotations, alterations, and citations omitted*). In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs.

---

[27]*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

Though that defendant's guideline range was 33-41 months, Judge Block "rendered a noncarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty months in part because conviction "made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

The collateral consequences that Mr. Judd has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment" and "adequate deterrence." First, as already described, Mr. Judd lost well-paying jobs in his career-chosen industry as a result of his highly publicized convictions. He will be foreclosed from similar jobs in the future, despite his considerable experience and advanced degree in hospitality management. Second, prior to his convictions, he was a lawful firearms owner. Though he was never a firearms enthusiast *per se*, he treasured his Second Amendment right to possess a firearm should there be a need to defend himself or his

family. He will not be able to possess a firearm for the rest of his life. Third, under Texas law, his right to vote is revoked until he has completed his full sentence, including all supervised release.[28] This is a particularly painful consequence to him as he always enjoyed the excitement voting on Election Day and even participated in registering other young Republicans to vote in the lead-up to the 2020 election. These long-lasting and irreversible consequences, in addition to a sentence of time-served, restitution, and a period of supervision are sufficient to meet the goals of 3553(a).

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[29] In short,

---

[28] https://www.usvotefoundation.org/voting-rights-restoration/texas.

[29] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.   Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict

there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Judd or others from committing this offense. And, indeed, the most effective deterrent is the certainty of punishment, not the severity of punishment. *See, e.g.*, *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) ("[G]iven that effective deterrence arises from certainty, not harshness, of punishment, our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on eliminating social conditions encouraging crime and on non-incarceratory techniques").

### iii. *A sentence of time-served avoids unwarranted disparities.*

Mr. Judd did not injure anyone. While it was reckless to throw the sparkler device and his actions could reasonably cause alarm, it was not a dangerous weapon and it could not have injured anyone, even in the context of a crowded tunnel.[30] Nor did he make any physical contact with any officer. Or enter the Capitol. A prison sentence that will remove Mr. Judd from the community and lock him away for years is not warranted and will create vast disparity with other cases involving similar conduct.

In sentencing Mr. Judd, counsel respectfully submits that the Court should consider the government's charging decisions and sentences imposed on rioters who attempted to breach a federal building in Portland, Oregon in protest during the

---

Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

[30] *See* Taylor Aff. at 2.

summer of 2020 and at other, non-January 6 protest actions here in the District of Columbia and elsewhere, specifically concerning protestors alleged to have thrown incendiary devices during heated political protest.

1. Continuing Riots in Portland, Oregon

Following the death of George Floyd, protestors descended on the Federal Courthouse in Portland, Oregon. According to the government, the protests in Portland were followed by "nightly criminal activity in the form of vandalism, destruction of property, looting, arson, and assault. . . the Courthouse has experienced significant damage to the façade, glass, and building fixtures during the weeks following this incident."[31] The majority of those protestors received diversionary agreements or their cases were outright dismissed by the government. Indeed, after an exhaustive review of the Portland riot assault cases, counsel identified two in which rioters received a prison sentence. In one case, the **defendant attacked a U.S. Marshal with a hammer**, swinging repeatedly at the Marshal's head and upper body and striking him on the back and the head. That defendant, Jacob Gaines, was sentenced to 46 months, despite the government's recommendation of 37 months.[32] In another case, the defendant, who was wearing combat gear, ignored multiple dispersal orders and then **used a wooden baseball**

---

[31] *United States v. Bouchard*, case no. 3:20-mj-00165 (D. Ore. July 24, 2020), ECF 1-1 at 4-5.

[32] *See* Chart assembling dispositions in Portland Riot cases, attached as Exhibit 4. On this point, the undersigned notes that the Court ordered the government to supplement its tables with cases brought in other jurisdictions one week before sentencing memoranda are due (ECF. No. 441). As of this filing, <u>the government has failed to comply with the Court's Order</u>.

**bat to strike a Marshal in the back, neck, and shoulder area**, causing injury. The assault was captured on video. In that case, the government requested 24 months, arguing that despite this vicious assault, mitigating factors such as the defendant's lack of a record and compliance on pre-trial release and guilty plea called for a below-guidelines sentence.[33]

One of undersigned counsel was before the Court for another January 6 sentencing and understood the Court to say that the Portland cases were different from that defendant's case. Mr. Judd respectfully submits that his case *in particular* is similar to the Portland riot cases and other cases discussed below involving significant assaultive conduct arising out of tumultuous and heated political protests. Further, the defense finds the government's protestation of difference in the selective prosecution context to bear little weight in the context of criminal sentencing. For as this Court has recognized, even though a January 6 defendant may not meet the high standard of establishing selective prosecution, this Court may – and Mr. Judd respectfully urges should – properly consider the dispositions in those cases at the sentencing phase.[34]

Consider for example, the case of Ty Fox. **Mr. Fox was captured on video lighting and throwing a large firework at Portland police and state troopers**

---

[33] *United States v. Dakotah Ray Horton*, 3:20CR419, Government's Sentencing Memo, ECF. No. 30.

[34] *See* Order denying Mr. Judd's Motion for Discovery on Selective Prosecution because defendant had "failed to make a credible showing of different treatment of similarly situated persons" but finding that "disparate charging decisions in similar circumstances may be relevant at sentencing." (internal citations omitted). ECF. No. 203 at 12.

**during a protest.** The firework caused a **large explosion**. When he was arrested, that defendant first told officers that he had thrown a water bottle at police. But when confronted with the video, he admitted to throwing the firework.[35] Still, Mr. Fox was only charged with civil disorder and his case was *dismissed* entirely upon motion of the government.[36]

In another Portland riot case, a defendant "used a homemade shield to strike the officer in the face."[37] A search of the suspect revealed an "extendable baton, OC spray, steel plated body armor, helmet, individual first aid kid, shin guards, gas mask, goggles…" This defendant's charges were also ultimately dismissed.[38] And in another case, a defendant "struck DUSM VICTIM 1 in the face with a shield and then punched DUSM Victim 1 in the face with a closed fist."[39] The defendant "resisted arrest by pulling his arms away from the DUSMs in an attempt to avoid being restrained."[40] This defendant's case was also dismissed.[41]

---

[35] Berstein, Maxine, *Astoria man accused of throwing a large firework at police during protest faces federal disorder charge*, OREGONIAN, Oct. 24, 2020; Oct. 24, 2020; https://www.oregonlive.com/portland/2020/10/astoria-man-accused-of-throwing-large-firework-at-police-during-protest-faces-federal-civil-disorder-charge.html

[36] *United States v. Fox*, 3:20CR501(D. Ore. 2020), ECF. No. 33.

[37] *United States v. Johnson*, case no. 3:20-mj-00170 (D. Ore. July 27, 2020), ECF No. 1 at 5.

[38] 3:20-mj-00170, ECF No. 9.

[39] *United States v. Webb*, case no. 3:20-mj-00169 (D. Ore. July 27, 2021) ECF no. 1 at 5.

[40] *Id*. at 6.

[41] Counsel respectfully refer the Court to a chart assembling Portland Riot case dispositions, attached as Exhibit 4, each of which further show that a sentence of time-served followed by supervision will come closer to avoiding disparity with other federal criminal cases that arose out of politically charged protest and unrest.

2.  Summer of 2020 Washington, D.C. Protests and Prosecutions

In another case that occurred in the context of protests that took place during the summer of 2020, a defendant who threw a large firework at police officers was charged in D.C. Superior Court by the same U.S. attorney's office that charged Mr. Judd.[42] Though that defendant was initially charged with assault with a dangerous weapon and even though the M-80 style firework the defendant threw burned a police officer's pant leg and was recovered on the scene, ***the case was entirely dismissed*** pursuant to a *nolle prosequi* submitted by the government.

3.  Summer of 2020 cases in which Molotov cocktails were thrown by protestors prosecuted in federal court.

Counsel submit that the Court should also consider the cases of Colinford Mattis and Urooj Rahman ("New York defendants"), two lawyers with degrees from elite universities[43] who were convicted in federal court for conspiracy to commit arson and possession of an explosive device **for throwing a homemade firebomb through a police car's window** during protests over George Floyd's death. Prior to throwing the firebomb, Mattis and Rahman sent messages as part of a group chat, discussing the use of weapons and violence to pursue social change. That night, prior to assembling the firebomb, they sent messages which expressed support for burning police stations and the use of Molotov cocktails, encouraged others to engage in violence, and disparaged law enforcement generally. **At one point, Mr. Mattis**

---

[42] *United States v. Alanna Rogers,* Case No. 2020 CF3 006970 (D.C. Super. Ct. dismissed Sept. 30, 2020).

[43] Mr. Mattis has degrees from Princeton and NYU School of law and Ms. Rahman from Fordham University.

**messaged Ms. Rahman about purchasing gasoline that could be used to burn NYPD vehicles. Incredibly, Ms. Rahman, then a lawyer, responded that projectiles and gasoline to set more fires were needed. They then purchased and assembled the Molotov cocktail. Next, they drove to a police precinct station house, where Ms. Rahman threw the lit Molotov cocktail through the smashed window of an NYPD sedan**. **The console of the vehicle started to burn.**[44] Thankfully, responding police officers extinguished the flames before the car set fire and no one was injured. For all of this conduct, the government requested a sentence of 18 to 24 months for both defendants. Mr. Mattis was sentenced to 12 months and one day and Ms. Rahman to 15 months.[45]

In another notorious case arising out of days-long protests in Minneapolis following the death of George Floyd in which defendants were convicted of throwing Molotov cocktails **and literally burning down a police station**, the government requested lower sentences than the sentence the government requests for Mr. Judd. Indeed, Minneapolis defendant Bryce Michael Williams was captured on surveillance video holding a Molotov cocktail while another person attempted to light the wick. Williams poured more fuel on the device. He then threw a box into an existing fire

---

[44] *United States v. Mattis et al*, 1:20CR203-BMC, ECF. No. 94 Government's Sentencing Memo. Counsel has attached the government's memo for a full description of the defendants' offenses as Exhibit 5.

[45] Thomas, David, *Judge Sentences Second New York lawyer in Molotov cocktail case*, REUTERS, January 26, 2023; https://www.reuters.com/legal/judge-sentences-second-new-york-lawyer-molotov-cocktail-case-2023-01-27; *see also* docket in *United States v. Mattis et al*, 1:20CR203-BMC, United States District Court of the Eastern District of New York.

outside the police station. After participating in burning a police station, Williams was interviewed on Instagram and stated, among other things, "yeah, I'm gonna riot too—it's just part of protesting."[46] For all of this conduct, the government requested 42 months and the district judge imposed a sentence of 27 months.

That the government requested a lesser sentences for defendants who planned and assisted in throwing lit Molotov cocktails than for David, who impetuously, without planning, tossed a small sparkler is disturbing and calls into question whether there are improper political motivations behind the government's charging decisions and sentencing requests in cases involving political protests. It also raises a legitimate question as to whether there is disparate treatment in the processing of cases depending upon the political motivations of the defendants. And while undersigned counsel recognize that this Court is not the Justice Department or an Inspector General of the Justice Department, this Court *is* tasked with ensuring that the sentence avoid unwarranted disparities and promote respect for the law. A sentence that does not check the government's patently unfair sentencing requests will serve neither of these purposes.

As for disparities, unlike the New York and Minnesota defendants, Mr. Judd did not plan and conspire to assemble any incendiary devices. He never set fire to anything. He did not injure anyone. He never espoused and encouraged violence against police officers. His messages and social media posts were limited to posting

---

[46] *United States v. Bryce Michael Williams*, 20CR181 (Dist. Mn), ECF. No. 143, undersigned has attached the government's memorandum as Exhibit 5.

Mr. Trump's tweets and non-violent silly memes. Unlike Ms. Rahman and Mr. Mattis, he was not educated with an advanced degree from an elite school. By contrast, in one impetuous moment, he tossed a small, non-lethal sparkler. It was a reckless and thoughtless act and he has and he will be punished for it. But there can be no argument that he is more culpable than the New York and Minnesota defendants, who literally planned to commit acts of terrorism. Indeed, Mr. Judd's crime did not exhibit near the level of planning and sophistication, and patently terroristic conduct of that of the New York defendants. And yet, the government is requesting an additional six and a half years for Mr. Judd.

With respect to promoting respect for the law, a sentence of time-served will promote respect law, while a sentence that condones the government's extreme, draconian request will undermine respect for the law. Indeed, if a Trump supporter with no record who injured no one and tossed a small sparkler into a crowd is sentenced as harshly or harsher than "liberal" defendants who carefully planned acts of what can be fairly described as terrorism, respect for the law will be irreparably undermined.

4. Similarly situated January 6 cases

While the Justice Department unquestionably treats January 6 defendants harsher than any other category of defendants arrested in connection with aggressive, disruptive political protests,[47] even when compared to sentences imposed

---

[47] Indeed, protestors who flooded into the Senate Atrium to protest Justice Kavanaugh's confirmation hearings after U.S. Capitol Police barricaded the front of Capitol were charged with misdemeanors, the vast majority of which were resolved

in January 6 cases, it is apparent that a sentence of time-served is appropriate for Mr. Judd. For example, in a recently concluded case in which the defendant was convicted of physically striking a police officer on January 6, *United States v. Sargent*, the Honorable Thomas Hogan imposed a sentence of 14 months. In addition to hitting an officer with his hand, that defendant recorded the scene on social media while boasting, "we got a clash of police going. . . Shit's getting fucking rowdy out here now. We got flash bangs."[48] After striking one officer, Sargent tried to strike another officer, but instead made contact with another protestor. At one point, that defendant bragged that he "duffed an officer in the face." He also told officers "fuck you guys, you guys are either with them or with us."[49] By contrast, Mr. Judd did not strike or injure any police officer. He did not yell abusive and threatening language towards police officers and he did not attempt to go inside the Capitol. These factors militate in favor of a sentence below that imposed on defendant Sargent.

In another January 6 assault on-a-federal-officers case, the Honorable Amy Berman Jackson imposed a 6-month sentence on a 57-year-old veteran who chanted at officers standing before him to "join us." When two officers tried to repel Mr.

---

by deferred prosecution agreement and nominal fines in Superior Court. Certainly, the Justice Department declined to wield the federal felony obstruction of justice statute against *those* protestors, though their conduct seemed inarguably designed to, and did, disrupt an official proceeding. *See* Jason Breslow, *The Resistance at the Kavanaugh Hearings: More than 200 arrests*, NATIONAL PUBLIC RADIO, September 8, 2018 (reporting that most of the over 200 Kavanaugh demonstrators arrested were charged with disorderly conduct or crowding and ordered to pay fines of $35 or $50).
[48] *United States v. Troy Sargent*, 1:21CR258(TFH), Gov. Sentencing Memo, ECF. No. 70.
[49] *Id.*

Leffingwell and the crowd around him, he struck both officers in the head.[50] Despite his physical assault of two officers, Judge Berman Jackson imposed a sentence of six months. In another case involving assaultive conduct, the Honorable Paul Friedman imposed a sentence of five months on January 6 defendant who, while carrying a large Confederate flag and a backpack with a knife and duct tape in, pushed a large lacrosse stick against a police officer's chest while yelling that he would not submit to commands.[51] Again, these cases demonstrates that a sentence of 45 days followed by supervised release is appropriate for Mr. Judd, who did not strike or injure any officers.

## Conclusion

David Judd admitted to, and feels ashamed for, the crimes that he committed. He has lost jobs, community respect, and his liberties and his freedom over the past two years. The government's request is unwarranted, unreasonable, and unjust. Counsels recommend that a sentence that is sufficient and not more than necessary is one that avoids additional active incarceration and that restrains Mr. Judd's freedoms of movement and choices in the community, with the clear message that any errors on his part can result in a revocation of his supervision and a return to the loss of his freedom and a prospective lengthy sentence of imprisonment.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

---

[50] *United States v. Leffingwell,* 1:21CR5 (ABJ), ECF. No. 4.
[51] *United States v. David Blair*, 1:21CR186 (PLD), ECF. No. 55.

_____/s/_____
ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500


_____/s/_____
EDWARD J. UNGVARSKY
Ungvarsky Law, PLLC
421 King Street, Suite 505
Alexandria, VA 22314
(571) 207-9710